## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

### Nos. 25-1595, 25-1642, 25-1846, 25-8019

---

STATE OF CALIFORNIA, ET AL.

*Petitioners*,

v.

UNITED STATES NATIONAL HIGHWAY
TRAFFIC SAFETY ADMINISTRATION, ET AL.,

*Respondents*.

---

On Petitions for Review of a Rule of the United States National
Highway Traffic Safety Administration

---

## OPENING BRIEF OF PETITIONER ZERO EMISSION
## TRANSPORTATION ASSOCIATION

---

Meghan E. Greenfield
mgreenfield@jenner.com
Elizabeth H. Starr
estarr@jenner.com
Jenner & Block LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Petitioner Zero Emission Transportation Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Zero Emission Transportation Association (ZETA) submits the following disclosure statement.

ZETA is an association of over three dozen companies committed to advocating for the advancement of the electric vehicle supply chain (*see* membership list here: https://www.zeta.org/about (last visited Oct. 23, 2025)). Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, ZETA states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. ZETA has no parent corporation, and no publicly held company has 10% or greater ownership in ZETA.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ...................................................... iv

JURISDICTIONAL STATEMENT ............................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW................ 2

INTRODUCTION.................................................................. 3

STATEMENT OF THE CASE.................................................... 5

    A.    Statutory and Regulatory Framework .................................. 5

    B.    NHTSA's Suspension Decision ............................................. 10

    C.    Harms to ZETA................................................................. 12

    D.    Procedural Background....................................................... 14

STANDING........................................................................ 15

STANDARD OF REVIEW ...................................................... 17

SUMMARY OF ARGUMENT .................................................. 18

ARGUMENT....................................................................... 20

I.    The Suspension Decision Must Be Vacated, and NHTSA
Must Be Directed to Comply with Its Statutory Obligations. ........ 20

    A.    EPCA requires NHTSA to promulgate fuel economy
standards and determine compliance with the fuel
economy program. ...................................................... 20

    B.    The Suspension Decision is an unlawful end-run
around EPCA and the APA. ...................................... 23

    C.    The Suspension Decision is also unlawful because
NHTSA was required to undertake full notice-and-
comment rulemaking to suspend existing rules. .................. 29

D. The Suspension Decision is arbitrary and capricious because it is not reasonable or reasonably explained. ........... 31

E. NHTSA cannot defend its abdication of its statutory responsibilities as a nonfinal exercise of enforcement discretion. .................................................................. 36

F. As a remedy, this Court should retain jurisdiction to ensure NHTSA resumes administration of the fuel economy program. .................................................. 39

CONCLUSION ................................................................. 41

# TABLE OF AUTHORITIES

**CASES**

*Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) ............... 26

*Allied Local & Regulatory Manufacturers Caucus v. EPA*, 215 F.3d 61 (D.C. Cir. 2000) ..................................................... 34

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................... 36

*California v. BLM*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018) ................... 26

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) .............. 25, 26, 29

*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) ........... 26, 29, 30

*Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987) ............................................................. 37

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) .............................. 39, 40

*Craker v. DEA*, 44 F.4th 48 (1st Cir. 2022) ............................................ 30

*Crowley Caribbean Transport, Inc. v. Peña*, 37 F.3d 671 (D.C. Cir. 1994) ............................................................. 38

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) .................................................................. 34, 35

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ................ 32, 33

*Families for Freedom v. Napolitano*, 628 F. Supp. 2d 535 (S.D.N.Y. 2009) ............................................................. 41

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .............. 32, 33

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................ 23, 25, 37, 38

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ............................................................. 16

*Levesque v. Block*, 723 F.2d 175 (1st Cir. 1983) ..................................... 30

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .......................................................... 32

*National Family Planning & Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227 (D.C. Cir. 1992).................................. 23

*Natural Resources Defense Council v. EPA*, 683 F.2d 752 (3d Cir. 1982) ........................................................ 31

*Natural Resources Defense Council v. NHTSA*, 894 F.3d 95 (2d Cir. 2018) ...................................... 17, 27, 28, 29, 30, 33, 41

*Northern States Power Co. v. United States Department of Energy*, 128 F.3d 754 (D.C. Cir.1997) ................................ 40

*Ohio v. EPA*, 603 U.S. 279 (2024) ........................................... 32

*OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808 (D.C. Cir. 1998) ...................................................... 37, 38

*Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983) ........................................... 41

*Public Citizen v. Steed*, 733 F.2d 93 (D.C. Cir. 1984) ...................... 32, 34

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ....................... 18, 31

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ......................................... 40, 41

*The Edward S. Quirk Co. v. NLRB*, 241 F.3d 41 (1st Cir. 2001) ...................................................... 18, 31

*Towns of Wellesley, Concord & Norwood v. FERC*, 829 F.2d 275 (1st Cir. 1987).......................................... 40-41

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ................................ 16

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996) ............................. 17

*United States v. Nixon*, 418 U.S. 683 (1974) ........................................... 23

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................... 17

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ................. 36

**STATUTES**

5 U.S.C. § 551(5) ....................................................................................... 31

5 U.S.C. § 553 ............................................................................................. 9

5 U.S.C. § 553(b) ................................................................................. 30, 31

5 U.S.C. § 553(c) .................................................................................. 30, 31

5 U.S.C. § 706 ........................................................................................... 39

5 U.S.C. § 706(1) ...................................................................................... 40

5 U.S.C. § 706(2)(A) ................................................................................ 18

5 U.S.C. § 706(2)(C) ................................................................................ 18

42 U.S.C. § 6201(5) .................................................................................... 5

49 U.S.C. §§ 32901-32904 .......................................................................... 1

49 U.S.C. §§ 32901-32919 ........................................................................ 26

49 U.S.C. § 32902(a) ...................................................................... 5, 20, 35

49 U.S.C. § 32902(b)(1)(A) ................................................................. 5, 20

49 U.S.C. § 32902(b)(1)(B) ................................................................. 5, 20

49 U.S.C. § 32902(b)(1)(C) ................................................................. 9, 21

49 U.S.C. § 32902(c) ...................................................................... 9, 27, 30

49 U.S.C. § 32902(g) .......................................................................... 9, 27

49 U.S.C. § 32902(k) .......................................................................... 9, 21

49 U.S.C. § 32903(a) ................................................................ 6

49 U.S.C. § 32903(b)(1) ............................................................ 6

49 U.S.C. § 32903(d) ........................................................... 7, 21

49 U.S.C. § 32903(e) ........................................................... 7, 21

49 U.S.C. § 32903(f) ................................................................ 6

49 U.S.C. § 32904(a)(1) ............................................................ 6

49 U.S.C. § 32904(e) ........................................................... 6, 21

49 U.S.C. § 32908 ................................................................... 1

49 U.S.C. § 32909(a) ............................................................... 1

49 U.S.C. § 32909(b) ............................................................... 1

49 U.S.C. § 32911(b) ............................................................... 7

**OTHER AUTHORITIES**

40 C.F.R. § 600.514-12 ............................................................ 6

49 C.F.R. § 1.95(a) ................................................................. 5

49 C.F.R. § 535.7(a)(1) ........................................................ 9, 22

49 C.F.R. § 535.7(a)(4) ........................................................ 9, 22

49 C.F.R. § 535.9(a)(2)(iii) ....................................................... 9

49 C.F.R. § 536.5(a) ............................................................... 7

49 C.F.R. § 536.5(b) ............................................................... 7

49 C.F.R. § 536.5(c)(1) ........................................................ 8, 22

49 C.F.R. § 536.5(c)(2) ........................................................ 8, 22

49 C.F.R. § 536.5(c)(3) ........................................................ 8, 22

49 C.F.R. § 536.5(d)(1) ..................................................................... 7, 21

49 C.F.R. § 536.8(a) .............................................................................. 8

49 C.F.R. § 553.13 ..................................................................... 9, 27, 30

Consolidation Order, *In re Nat'l Highway Traffic Safety Admin., Dep't of Transp.*, Resetting the Corporate Average Fuel Economy Program, 90 Fed. Reg. 24,518 (June 11, 2025), MCP No. 197 (J.P.M.L. July 3, 2025) ...................................... 14

*Corporate Average Fuel Economy Standards for Model Year 2024-2026 Passenger Cars and Light Trucks*, 87 Fed. Reg. 25,710 (May 2, 2022) ....................................................... 5, 21

*Corporate Average Fuel Economy Standards for Passenger Cars and Light Trucks for Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond*, 89 Fed. Reg. 52,540 (June 24, 2024).......................................................... 5, 21

White House Office of Management & Budget, Office of Info. & Reg. Affairs, *Regulatory Actions Currently Under Review by Agency*, https://www.reginfo.gov/public/do/eAgenda ViewRule?pubId=202504&RIN=2127-AM76 (last visited Nov. 12, 2025) ..................................................................... 11

## JURISDICTIONAL STATEMENT

Under the Energy Policy and Conservation Act, this Court has jurisdiction over a petition for review filed by a person that resides or has its principal place of business in this circuit and "that may be adversely affected by a regulation prescribed in carrying out any of [49 U.S.C. §§ 32901–32904 or 32908]." 49 U.S.C. § 32909(a). The rule at issue in this case is subject to review under that provision because it is a regulation and was prescribed in carrying out one of 49 U.S.C. §§ 32901– 32904 or 32908. Further, at least one of the petitioners in these consolidated cases resides in this circuit, and the petitions were timely filed "not later than 59 days after the regulation [wa]s prescribed." *Id*. § 32909(b).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The Energy Policy and Conservation Act (EPCA) requires the National Highway Traffic Safety Administration (NHTSA) to promulgate fuel economy standards for motor vehicles, and then annually ensure compliance with those standards. EPCA further requires that any revision to these standards be accomplished through notice-and-comment rulemaking under the Administrative Procedure Act (APA). Unhappy with the standards currently in effect, NHTSA issued an "interpretive rule" announcing that enforcement of existing standards is suspended pending NHTSA's reconsideration of those standards. This case presents a single issue:

1.     Whether EPCA and the APA bar NHTSA from issuing an "interpretive rule" with the purpose and effect of suspending existing, binding fuel economy standards without completing notice-and-comment rulemaking to amend those standards, and without taking into account longstanding reliance interests.

# INTRODUCTION

The Zero Emission Transportation Association (ZETA)—a coalition of companies spanning the electric vehicle supply chain—challenges an "interpretive rule" by the National Highway Traffic Safety Administration (NHTSA) that purports to exercise "discretion" in declining to enforce existing vehicle fuel economy standards for however long it takes the Agency to reconsider and revise those standards (Suspension Decision). Consistent with that decision, the Agency has since refused to enforce existing fuel economy standards wholesale.

The Suspension Decision is patently unlawful. The Agency has identified no statutory or regulatory authority authorizing it to halt administration of its binding regulations without amending them first, and there is none. The Suspension Decision thus violates the Energy Policy and Conservation Act (EPCA). The Suspension Decision is further unlawful because the Agency could only accomplish this suspension through a notice-and-comment rulemaking to promulgate a new legislative rule, which it did not do. What's more, NHTSA's decision is arbitrary and capricious in violation of the Administrative Procedure Act (APA) because it disregards—indeed, does not even acknowledge—ZETA

members' substantial reliance on administration of the existing fuel economy program.

The Suspension Decision inflicts significant and escalating harm on ZETA's members. Several members are electric vehicle manufacturers. Because their vehicle fleets exceed federal fuel economy standards, they earn compliance "credits" each year under the federal fuel economy program, which they then trade to other manufacturers whose fleets under-perform the standards. Those credits are an important source of revenue for electric vehicle manufacturers. But, as a result of NHTSA's abdication of its statutory and regulatory duties to annually assess compliance, ZETA members are unable to finalize more than a $100 million worth of already-negotiated transactions for those credits.

ZETA seeks narrow but essential relief. This Court should hold unlawful and vacate the Suspension Decision. Moreover, this Court should retain jurisdiction and order regular progress reports to ensure that NHTSA resumes administration of the fuel economy program as required under EPCA and its implementing regulations.

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Framework

Congress enacted the Energy Policy and Conservation Act (EPCA) in the immediate wake of the 1973–74 oil crisis. Its purpose was to reduce the risk of another serious energy crisis, to be accomplished in part through "improved energy efficiency of motor vehicles" and certain other consumer products. 42 U.S.C. § 6201(5).

EPCA, in its current form, thus directs the Secretary of Transportation to "prescribe by regulation" corporate average fuel economy (CAFE) standards for automobiles, a category that includes passenger cars and light trucks. 49 U.S.C. § 32902(a); *see id.* § 32902(b)(1)(A)–(B); 49 C.F.R. § 1.95(a) (delegation of authority to NHTSA). Consistent with that statutory command, NHTSA has promulgated regulations prescribing fuel economy standards for automobiles.[1]

---

[1] *See, e.g.*, *Corporate Average Fuel Economy Standards for Model Year 2024-2026 Passenger Cars and Light Trucks*, 87 Fed. Reg. 25,710 (May 2, 2022); *Corporate Average Fuel Economy Standards for Passenger Cars and Light Trucks for Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond*, 89 Fed. Reg. 52,540 (June 24, 2024).

EPCA allows manufacturers to comply with these fuel economy standards by generating and trading "credits." "When the average fuel economy of passenger automobiles manufactured by a manufacturer in a particular model year exceeds an applicable average fuel economy standard," then "the manufacturer earns credits." 49 U.S.C. § 32903(a). Those credits "are available to a manufacturer at the end of the model year in which earned." *Id.* § 32903(b)(1). Such credits can then be applied to achieve compliance with the fuel economy standards in any of the three prior model years or five subsequent model years. *Id.* § 32903(a). Manufacturers can also trade unneeded credits to other manufacturers for use to meet their respective compliance obligations. *Id.* § 32903(f).

To determine whether a manufacturer has complied with fuel economy regulations, the Environmental Protection Agency (EPA) evaluates the manufacturer's fleet fuel economy. Specifically, EPA calculates the "average fuel economy of a manufacturer," *id.* § 32904(a)(1), based on reports submitted by manufacturers, 40 C.F.R. § 600.514-12. EPCA then provides that EPA "shall report measurements and calculations under this section to the Secretary of Transportation." 49 U.S.C. § 32904(e).

6

Once EPA reports measurements and calculations to NHTSA, NHTSA has a statutory duty to determine compliance. EPCA provides that "[t]he Secretary of Transportation shall apply credits to a model year on the basis of the number of tenths of a mile a gallon by which the manufacturer involved was below the applicable average fuel economy standard for that model year and the number of passenger automobiles manufactured that model year by the manufacturer." *Id*. § 32903(d); *id*. § 32903(e) (applying same instruction to non-passenger vehicles). Compliance "is determined after considering credits available to the manufacturer under section 32903 of this title"—that is, available credits from other model years, and credits from trading. *Id*. § 32911(b).

NHTSA's regulations prescribe the mechanics of credit transactions. To assess compliance and effectuate credit trades between manufacturers, NHTSA "maintains accounts for each" manufacturer that has earned credits pursuant to the statute. 49 C.F.R. § 536.5(a)–(b). "[E]ach year," NHTSA "assesses compliance with fuel economy standards" and "adds credits to [a] manufacturer's account" if the manufacturer's fleet has above standard fuel economy. *Id*. § 536.5(d)(1). Once credits have been added, a manufacturer then may "submit a credit

7

instruction" to NHTSA which allows the manufacturer to "carry credits forward, backward, transfer credits, or trade credits into other credit accounts." *Id.* § 536.5(c)(1); *id.* § 536.8(a) ("If a credit holder wishes to trade credits to another party, the current credit holder and the receiving party must jointly issue an instruction to NHTSA, identifying the quantity, vintage, compliance category, and originator of the credits to be traded.").

EPCA's implementing regulations limit NHTSA's discretion in executing these instructions. The provision governing transactions, entitled "[a]utomatic debits and credits of accounts," provides that "[u]pon receipt of a credit instruction from an existing credit holder, NHTSA verifies the presence of sufficient credits in the account(s) of the credit holder(s) involved as applicable and notifies the credit holder(s) that the credits will be debited from and/or credited to the accounts involved, as specified in the credit instruction." *Id.* § 536.5(c)(2). Then, "[a]fter notifying the credit holder(s), all accounts involved are either credited or debited, as appropriate, in line with the credit instruction." *Id.* § 536.5(c)(3).

In addition to establishing the CAFE program for light-duty

vehicles, EPCA requires NHTSA to establish separate fuel economy standards for work trucks and commercial medium- and heavy-duty (MDHD) on-highway vehicles. *See* 49 U.S.C. § 32902(b)(1)(C), (k). As with the CAFE program, manufacturers subject to the MDHD program earn credits for outperforming applicable fuel consumption standards, *see* 49 C.F.R. § 535.7(a)(1); receive notification from NHTSA "after the end of each model year" regarding their credit balances, *id.* § 535.9(a)(2)(iii); and may trade credits amongst themselves to meet their compliance obligations, *id.* § 535.7(a)(4).

Under EPCA, if the Secretary wishes to amend already-established fuel economy standards, it must "prescribe regulations amending the standard." 49 U.S.C. § 32902(c), (g). EPCA makes clear that such amendments must be accomplished through notice-and-comment rulemaking. It states that APA "Section 553 of title 5 applies to a proceeding to amend the standard." *Id.* § 32902(c); 5 U.S.C. § 553 (requiring notice and comment for agency rulemaking). The implementing regulations reflect the same. *See* 49 C.F.R. § 553.13 (requiring notice-and-comment rulemaking to promulgate regulations). EPCA provides no authority to suspend existing fuel economy standards

pending reconsideration.

## B. NHTSA's Suspension Decision

On June 11, 2025, NHTSA issued an "interpretive rule"—without notice and comment—entitled *Resetting the Corporate Average Fuel Economy Program*, 90 Fed. Reg. 24,518 (June 11, 2025) (the Rule). Among other things, the Rule advances a new interpretation of NHTSA's statutory authority under EPCA to set fuel economy standards, and pledges to adopt this interpretation through a notice-and-comment rulemaking. According to NHTSA, the Rule "does not, itself, change existing CAFE or MDHD standards or any rights or obligations under the CAFE or MDHD programs." *Id.* at 24,525. "Instead, this interpretation lays the appropriate groundwork for standard-setting rulemakings that will reset the agency's regulatory programs." *Id.* A proposed rule to amend fuel economy standards is pending review at the

White House Office of Management and Budget, but has not yet been published.[2]

The Rule also encompasses the Suspension Decision: NHTSA's decision not to enforce, anywhere in the country, existing fuel economy standards that are presently in effect and binding on NHTSA and manufacturers. Without citation to statutory authority, NHTSA announced that "[p]ending the rulemaking process for the establishment of replacement standards, NHTSA will exercise its enforcement authority with regard to all existing CAFE and MDHD standards in accordance with the interpretation set forth in th[e] rule." *Id.* at 24,526. Because there are no fuel economy standards in effect that reflect NHTSA's new interpretation, exercising enforcement discretion in this context can mean only one thing—declining to administer the standards currently in effect pending the new rulemaking.

Then, in a July 2025 letter to manufacturers, NHTSA made express what was implicit in the Rule—that it had halted the administration of

--------------------

[2] White House Office of Management & Budget, Office of Info. & Reg. Affairs, *Regulatory Actions Currently Under Review by Agency*, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202504&RIN=2127-AM76 (last visited Nov. 12, 2025).

fuel economy regulations and was no longer evaluating manufacturers' compliance with the existing standards. *See* Letter from Peter Simshauser, Chief Counsel for NHTSA, to manufacturers (July 11, 2025) (ZETA Pet. Ex. B) (explaining that NHTSA will not issue compliance notifications for model year 2022 and onward while it reconsiders current fuel economy standards).[3]

## C. Harms to ZETA

ZETA is an association comprising over three dozen companies committed to promoting electric vehicle adoption and maintaining American electric vehicle manufacturing dominance in global markets. The Association's members include major American electric vehicle manufacturers such as Tesla, Inc., Rivian Automotive, Inc., and Lucid Group, Inc.

Those electric vehicle manufacturers have earned tradeable compliance credits under the CAFE and MDHD programs for exceeding fuel economy standards in past model years. They have then entered into

_____

[3] The cited ZETA exhibits and declaration were filed with the Petition for Review, *Zero Emission Transportation Ass'n v. NHTSA*, No. 25-1167 (D.C. Cir. Aug. 6, 2025).

contracts to sell those credits to other vehicle manufacturers. *See, e.g.*, Nevers Decl. ¶ 7 (ZETA Pet. Ex. C); Ramanathan Decl. ¶ 7 (ZETA Pet. Ex. D).

But until NHTSA complies with its statutory and regulatory obligation to assess compliance, electric vehicle manufacturers cannot finalize transactions for credits they sold in years past. *See* Nevers Decl. ¶ 12; Ramanathan Decl. ¶¶ 9–12. These contracts were negotiated by willing parties under governing law and, all told, are valued upwards of $100 million. *See* Nevers Decl. ¶ 14; Ramanathan Decl. ¶ 12.

Applying the Suspension Decision, NHTSA has refused to assess compliance. It has announced it will not issue compliance notifications, or transfer credits earned by vehicle manufacturers for exceeding applicable standards to other vehicle manufacturers who have already contracted to purchase those credits to meet their own compliance obligations. *See* Letter from Peter Simshauser, Chief Counsel for NHTSA, to manufacturers (July 11, 2025).

The harms caused by the Suspension Decision are compounded by the fact that—at the time the Rule was published—NHTSA was behind on processing compliance notifications. In fact, for light-duty vehicles,

13

NHTSA has not processed end-of-year reports and issued the required compliance notifications for model year 2022 onward—despite the fact that EPA has assessed manufacturers' fuel economy and submitted reports to NHTSA for several of these years. *See* Nevers Decl. ¶ 11; Ramanathan Decl. ¶ 10. For medium-duty pickups and vans, NHTSA has not yet processed end-of-year reports or issued compliance notifications for model year 2018 onward. *See* Nevers Decl. ¶ 11.

### D. Procedural Background

On August 6, 2025, ZETA filed a petition challenging the Rule in the U.S. Court of Appeals for the District of Columbia Circuit. The D.C. Circuit transferred that petition to this Court, where petitions for review of the Rule had already been consolidated. *See* Order, No. 25-1167 (D.C. Cir. Sept. 5, 2025); Consolidation Order, *In re Nat'l Highway Traffic Safety Admin., Dep't of Transp.*, Resetting the Corporate Average Fuel Economy Program, 90 Fed. Reg. 24,518 (June 11, 2025), MCP No. 197 (J.P.M.L. July 3, 2025). On September 29, 2025, this Court then consolidated ZETA's petition with other pending petitions by State and Local Governments (No. 25-1595) and Public Interest Organizations (No. 25-1642). *See* No. 25-8019, ECF No. 118346340 at 2–3.

On October 8, 2025, Petitioners jointly filed an unopposed motion for abeyance, asking the Court to hold in abeyance their challenges to the Rule's re-interpretation of NHTSA's statutory authority, but seeking to have ZETA's challenge to the Suspension Decision proceed. *See* No. 25-8019, ECF 118350641 at 7–9. The government then moved to hold the cases in abeyance in their entirety. *See* No. 25-8019, ECF 118354704 at 1. ZETA consents to abeyance of its challenge to NHTSA's re-interpretation of its statutory authority, but opposes the government's request to also place its challenge to the Suspension Decision in abeyance. *See* No. 25-8019, ECF 118358667 at 2. The Court has not yet ruled on those abeyance motions.

Because ZETA agrees to abeyance of its challenge to NHTSA's re-interpretation of its statutory authority, this brief focuses only on ZETA's challenge to the Suspension Decision.

## STANDING

An association such as ZETA may establish Article III standing by showing "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An association's member would otherwise have standing in its own right if it establishes that: (1) it has suffered "an injury in fact that is concrete, particularized, and actual or imminent"; (2) "the injury was likely caused by the [respondent]"; and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). ZETA meets all the requirements for Article III standing.

*First*, at least one of ZETA's members would have standing in its own right. Several ZETA members are electric vehicle manufacturers. As a result of NHTSA's unlawful Suspension Decision, those electric vehicle manufacturers are unable to finalize already negotiated and contracted credit transactions worth well over a hundred million dollars. *See, e.g.*, Nevers Decl. ¶¶ 10–14; Ramanathan Decl. ¶¶ 9–12. Such monetary harms "readily qualify as concrete injuries under Article III." *TransUnion*, 594 U.S. at 425. Here, those harms are caused by NHTSA's implementation of the Suspension Decision including the Agency's refusal to assess compliance, process manufacturers' instructions, and issue compliance notifications. These harms can be remedied by vacating

NHTSA's Suspension Decision.

*Second*, the interests ZETA seeks to protect are germane to ZETA's purpose of advocating on behalf of its members for policies that promote vehicle electrification. ZETA's claims in this litigation relate directly to its organizational purpose because NHTSA's refusal to administer existing fuel economy standards undermines regulatory incentives for vehicle electrification.

*Third*, there is no need for ZETA's members to participate directly in this litigation. ZETA's claims and requested relief are not "peculiar to [an] individual member," nor do they "require individualized proof." *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975); *cf. United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("[I]ndividual participation is not normally necessary when an association seeks prospective or injunctive relief for its members." (quotation marks omitted)).

## STANDARD OF REVIEW

EPCA regulations are reviewed under the standards set by the APA. *See Nat. Res. Def. Council v. NHTSA*, 894 F.3d 95, 107–08 (2d Cir. 2018) (*NRDC*). The Court may therefore "hold unlawful and set aside

agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

In evaluating NHTSA's Suspension Decision, "it is [NHTSA's] rationale that matters." *The Edward S. Quirk Co. v. NLRB*, 241 F.3d 41, 45 (1st Cir. 2001) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)). This Court can only uphold a decision on "the grounds upon which the agency acted." *Chenery*, 318 U.S. at 95.

## SUMMARY OF ARGUMENT

EPCA requires NHTSA to promulgate fuel economy standards and, on an annual basis, determine compliance with the fuel economy program. It confers no discretion on NHTSA to halt enforcement of fuel economy standards without first amending them through notice-and-comment rulemaking.

The Suspension Decision is an unlawful end run around EPCA and the APA. Through the ruse of exercising "enforcement discretion," NHTSA's Suspension Decision seeks to achieve what EPCA and the APA forbid: the suspension of binding fuel economy standards pending their

reconsideration. For that reason alone, the Suspension Decision must be held unlawful and vacated.

To suspend the effectiveness of the existing standards, NHTSA was required to undertake a notice-and-comment rulemaking to promulgate a new legislative rule (not an "interpretive" one) and revise the underlying standards. Because NHTSA failed to do so, the Suspension Decision is also procedurally invalid.

What's more, the Suspension Decision is arbitrary and capricious in violation of the APA. NHTSA provided no justification whatsoever—much less a reasoned one—for halting all enforcement of binding regulations that are still in effect. NHTSA also failed to acknowledge, let alone consider, vehicle manufacturers' serious reliance interests in the administration of existing fuel economy standards. The Suspension Decision is profoundly disruptive, preventing electric vehicle manufacturers from finalizing more than a $100 million in credit contracts that have already been willingly negotiated with other vehicle manufacturers under current federal law.

The Suspension Decision is not immune from judicial review simply because NHTSA styled it as a decision not to take enforcement action.

19

This is not a situation of case-by-case enforcement discretion. Rather, in the Rule, NHTSA consciously and expressly adopted a general policy of abdicating its statutory responsibility to uphold and implement validly issued regulations. It is well-settled that such a policy is subject to judicial review.

As a remedy, this Court should vacate the Suspension Decision. To ensure NHTSA resumes enforcement, this Court should further retain jurisdiction over this matter and require regular progress reports on NHTSA's efforts to resume administration of the program.

## ARGUMENT

### I. The Suspension Decision Must Be Vacated, and NHTSA Must Be Directed to Comply with Its Statutory Obligations.

#### A.     EPCA requires NHTSA to promulgate fuel economy standards and determine compliance with the fuel economy program.

EPCA requires NHTSA to promulgate and administer fuel economy standards. Specifically, EPCA directs NHTSA to "prescrib[e] by regulation" corporate average fuel economy (CAFE) standards for automobiles, a category that includes passenger cars and light trucks. 49 U.S.C. § 32902(a); *see id.* § 32902(b)(1)(A)–(B). EPCA also mandates that NHTSA "prescribe . . . fuel economy standards" for work trucks and

commercial medium- and heavy-duty (MDHD) on-highway vehicles. *Id.* § 32902(b)(1)(C); *see id.* § 32902(k). NHTSA has promulgated regulations for both programs, and those regulations are currently in effect.[4]

Once CAFE standards are in effect, EPCA mandates that NHTSA determine manufacturers' compliance with existing standards annually, after each model year has passed. As part of the compliance process, EPA first reports manufacturers' fuel economy "measurements and calculations" to NHTSA. *Id.* § 32904(e). Then, NHTSA "shall apply credits to a model year" based on this report. *Id.* § 32903(d) (applying to light-duty vehicles); *id.* § 32903(e) (applying same instruction to processing credits for non-passenger vehicles).

"[E]ach year," NHTSA must "assess[ ] compliance with fuel economy standards" based on EPA's reports and "add[ ] credits to [a] manufacturer's account" if the manufacturer's fleet has above standard fuel economy. 49 C.F.R. § 536.5(d)(1); *see also* 49 U.S.C. § 32911(b) (compliance "is determined after considering credits available to the manufacturer under section 32903 of this title"). Before NHTSA

---

[4] *See, e.g.*, 87 Fed. Reg. 25,710; 89 Fed. Reg. 52,540.

determines compliance, a manufacturer may "submit a credit instruction" to NHTSA which allows the manufacturer to "carry credits forward, backward, transfer credits, or trade credits into other credit accounts." 49 C.F.R. § 536.5(c)(1). The Agency's processing of these instructions is "[a]utomatic" once "NHTSA verifies the presence of sufficient credits in the account(s) of the credit holder(s) involved as applicable and notifies the credit holder(s) that the credits will be debited from and/or credited to the accounts involved, as specified in the credit instruction." *Id.* § 536.5(c)(2). The regulation confers no discretion on NHTSA to do anything other than process instructions (provided they are accurate), and issue notifications. It states that "all accounts involved are either credited or debited, as appropriate, in line with the credit instruction." *Id.* § 536.5(c)(3).

The same compliance structure applies to the medium and heavy-duty fuel economy program. *See id.* § 535.7(a)(1) (describing how credits are earned); *id.* § 535.7(a)(4) (providing that manufacturers receive notification "[a]fter the end of each model year" regarding their credit balances, and may trade credits amongst themselves to meet their compliance obligations). Taken together, NHTSA is required by statute

and regulation to annually assess compliance with fuel economy standards, including by processing manufacturers' instructions and sending manufacturers compliance notifications.

NHTSA is bound by this statutory and regulatory framework as long as it is on the books. It goes without saying that NHTSA, as an agency created by Congress, cannot ignore Congress's statutory commands in EPCA. What's more, NHTSA is bound by its own regulations "[s]o long as [they] remain[ ] in force." *United States v. Nixon*, 418 U.S. 683, 696 (1974). *See also Nat'l Family Planning & Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992) ("[A]n agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked."). In short, "Congress does not intend administrative agencies, agents of [its] own creation, to ignore clear … regulatory, [or] statutory … commands." *Heckler v. Chaney*, 470 U.S. 821, 839 (1985) (Brennan, J., concurring).

## B.  The Suspension Decision is an unlawful end-run around EPCA and the APA.

The purpose and effect of the Suspension Decision is to suspend the fuel economy regulations while NHTSA reconsiders those rules. But neither EPCA nor the APA authorizes NHTSA to halt administration of

the fuel economy program set by regulation while the Agency reconsiders the regulations.

The Suspension Decision announced that "[p]ending the rulemaking process for the establishment of replacement standards, NHTSA will exercise its enforcement authority with regard to all existing CAFE and MDHD standards in accordance with the interpretation set forth in th[e] rule." 90 Fed. Reg. at 24,526. Because no standards reflecting NHTSA's new interpretation exist to administer, the Agency's statement that it would "exercise enforcement authority . . . in accordance with the [new] interpretation" could only mean it would pause administration of the program altogether while it reconsidered the standards.

The following month, in July 2025, the Agency left no doubt about what it intended by "exercis[ing] its enforcement authority." In a July 2025 Letter to manufacturers, NHTSA cited to the Suspension Decision and announced that, as a consequence, it would refuse to issue notifications to manufacturers regarding their compliance with existing fuel economy standards. *See* Letter from Peter Simshauser, Chief Counsel for NHTSA, to manufacturers (July 11, 2025) (citing to the

Suspension Decision, and explaining that NHTSA will not issue compliance notifications for model year 2022 and onward while it reconsiders current fuel economy standards).

The Suspension Decision thus was not intended to operate as enforcement discretion in any traditional sense, such as where an agency declines to apply penalties to individual parties based on specific facts. *See Heckler*, 470 U.S. at 831. Rather, while gesturing at enforcement discretion, NHTSA intended the Suspension Decision to suspend its administration of the fuel economy regulations pending reconsideration of those rules.

NHTSA has applied the Suspension Decision to ZETA's members. Since publishing the Suspension Decision and issuing the July 2025 Letter, NHTSA has refused to issue compliance notifications and allow for trades. *See* Nevers Decl. ¶¶ 10–12, 15; Ramanathan Decl. ¶¶ 9–10.

It is black-letter law that NHTSA cannot suspend binding regulations absent statutory authorization from Congress. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S.

290, 297 (2013)). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Id*. (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

Therefore, if NHTSA wishes to pause regulatory obligations while it reconsiders the underlying regulations, NHTSA "must point to something in [the governing statutes] or the APA that gives it authority" to do so. *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017). It cannot unilaterally suspend administration of a regulatory program: "[A] decision to reconsider a rule does not simultaneously convey authority to indefinitely delay the existing rule pending that reconsideration." *Air All. Hou. v. EPA*, 906 F.3d 1049, 1065, 1067 (D.C. Cir. 2018) (quoting *NRDC*, 894 F.3d at 111–12); *see also California v. BLM*, 286 F. Supp. 3d 1054, 1064 (N.D. Cal. 2018) (agency "cannot use the purported proposed future revision, which has yet to be passed, as a justification for the Suspension Rule.").

The Suspension Decision identifies no statutory authority to suspend the fuel economy rules pending reconsideration, and there is none. NHTSA's authority to administer fuel economy standards derives from EPCA, 49 U.S.C. §§ 32901–32919. These provisions speak in

26

mandatory terms about NHTSA's duty to promulgate regulations and annually assess compliance. *See supra* at 20–23. While NHTSA may "amend[ ]" fuel economy standards, 49 U.S.C. § 32902(c), (g), it may only do so by using notice-and-comment rulemaking to promulgate a new regulation in place of the old standards. *Id.* § 32902(c) ("Section 553 of title 5 applies to a proceeding to amend the standard"); 49 C.F.R. § 553.13 ("Unless the Administrator, for good cause, finds that notice is impracticable, unnecessary, or contrary to the public interest, and incorporates that finding and a brief statement of the reasons for it in the rule, a notice of proposed rulemaking is issued and interested persons are invited to participate"). Nothing in EPCA, nor any other statute, grants NHTSA authority to suspend existing regulations pending their reconsideration.

That is exactly what the Second Circuit held when considering a NHTSA delay rule involving enforcement of the fuel economy program. Back in 2016, NHTSA promulgated a rule suspending implementation of a rule that increased penalties for fuel economy violations. *See NRDC*, 894 F.3d at 100–02. NHTSA defended its authority to suspend the penalty rule on three grounds: (1) that the delay was needed to allow for

27

reconsideration; (2) that the delay was "consistent with NHTSA's statutory authority to administer the CAFE standards program"; and (3) that the Agency had "'inherent authority' to indefinitely delay the rule" at issue. *Id*. at 111–13.

The Second Circuit rejected all three arguments, concluding that NHTSA had no authority to suspend fuel economy regulations pending reconsideration. *Id*. On the first, the Court concluded that "a decision to reconsider a rule does not simultaneously convey authority to indefinitely delay the existing rule pending that reconsideration." *Id*. at 111–12 (citing *Clean Air Council*, 862 F.3d at 9). Next, the Court held that the EPCA provisions cited by the government there did not "authorize[ ] indefinite delay . . . pending reconsideration or for any other reason." *Id*. at 112. And, lastly, the Court applied the "well-established principle that an agency literally has no power to act unless and until Congress confers power upon it" to conclude that "NHTSA's indefinite delay was issued 'in excess of statutory authority.'" *Id*. at 112–13 (quoting 5 U.S.C. § 706(2)(C)).

For similar reasons, NHTSA's Suspension Decision must be set aside. NHTSA lacks any statutory authority to unilaterally suspend a

rule pending reconsideration. And it cannot bootstrap its way to the same result by purporting to invoke "enforcement discretion." NHTSA must "enforce [the] lawfully issued final rule[s] . . . while it reconsiders [those rules]." *Clean Air Council*, 862 F.3d at 9; *NRDC*, 894 F.3d at 100–02. The Suspension Decision is thus "ultra vires, and violates the Administrative Procedure Act." *City of Providence*, 954 F.3d at 31 (citing *City of Arlington*, 569 U.S. at 297; 5 U.S.C. § 706(2)(C)).[5]

### C. The Suspension Decision is also unlawful because NHTSA was required to undertake full notice-and-comment rulemaking to suspend existing rules.

The only lawful path for NHTSA to suspend compliance obligations with the existing standards, which were promulgated as legislative rules, was to undertake a notice-and-comment rulemaking and revise the rules.

---

[5] The government has suggested that the temporary nature of the Suspension Decision somehow mitigates its illegality. *See* No. 25-8019, ECF 118361467 at 5. It does not. If anything, the agency's candid acknowledgment that it suspended enforcement, without any public process, for the express purpose of reconsidering the underlying standards only underscores the lawlessness of its approach. As courts have held time and again, an agency cannot hit pause on its statutory and regulatory responsibilities as a procedural workaround to avoid the notice-and-comment rulemaking process required to change course. EPCA and the APA do not permit such shortcuts, and this Court should not countenance them.

NHTSA's "interpretive rule" cannot accomplish this. Because the Agency did not undertake notice and comment, the Suspension Decision is invalid.

EPCA and its implementing regulations require NHTSA to undertake notice-and-comment rulemaking under the APA to amend existing rules. 49 U.S.C. § 32902(c); 49 C.F.R. § 553.13. Under the APA, an agency must provide the public with "[g]eneral notice of proposed rule making," as well as "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)–(c). Notice and comment "contribute[ ] importantly to self-governance and help[ ] ensure that administrative agencies will consider all relevant factors before acting." *Levesque v. Block*, 723 F.2d 175, 187 (1st Cir. 1983). "An agency's failure to comply with these procedural requirements renders a rule invalid." *Craker v. DEA*, 44 F.4th 48, 55 (1st Cir. 2022).

The notice-and-comment requirement applies with no less force when an agency seeks to suspend or delay a final rule. Suspending the obligations of a final rule is "tantamount to amending or revoking a rule." *Clean Air Council*, 862 F.3d at 6; *NRDC*, 894 F.3d at 111–13. Indeed, the

30

APA specifically provides that amending or revoking a rule requires notice and comment, 5 U.S.C. §§ 551(5), 553(b)–(c). *See Nat. Res. Def. Council v. EPA*, 683 F.2d 752, 762 (3d Cir. 1982); *id.* at 763 n.23 ("To allow the indefinite postponement of a rule without compliance with the APA, when a repeal would require such compliance, would allow an agency to do indirectly what it cannot do directly."). Thus, NHTSA was required to conduct notice-and-comment rulemaking if it wished to suspend the existing light-, medium-, and heavy-duty vehicle standards.[6] Because NHTSA failed to do so, the Rule is procedurally invalid and must be set aside.

### D. The Suspension Decision is arbitrary and capricious because it is not reasonable or reasonably explained.

Even if EPCA and the APA permitted NHTSA to suspend binding fuel economy regulations under the guise of "enforcement discretion" (which, again, they do not), the Suspension Decision is still unlawful and

---

[6] NHTSA cannot claim now some alternative authority to promulgate the Suspension Decision without notice and comment. "[I]t is [NHTSA's] rationale that matters." *The Edward S. Quirk Co.*, 241 F.3d at 45 (citing *Chenery*, 318 U.S. at 87–88). This Court can only uphold a decision on "the grounds upon which the agency acted," and not any rationale manufactured in an appellate brief. *Chenery*, 318 U.S. at 95.

must be vacated because it is arbitrary and capricious. It is a fundamental tenet of administrative law that an agency action must be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation omitted). The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). Where an agency fails to provide such an explanation, "its action is arbitrary and capricious" and "cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016).

Moreover, where an agency wishes to depart from a prior rule, it "must show that there are good reasons for the new policy" and must take into account "serious reliance interests" engendered by the old policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Those principles apply with equal force when an agency suspends an existing rule. *See Public Citizen v. Steed*, 733 F.2d 93, 98–99 (D.C. Cir. 1984) (concluding that NHTSA's suspension of final rule was arbitrary and capricious). NHTSA was therefore required to give a "reasoned

32

explanation" for halting all enforcement of existing fuel economy standards, and to take account of "serious reliance interests" based on those existing standards. *Fox*, 556 U.S. at 515.

Yet NHTSA "gave almost no reasons at all," much less "good reasons," for the Suspension Decision. *Encino Motorcars*, 579 U.S. at 223–24 (citation omitted). In the Rule itself, NHTSA said only that, "[p]ending the rulemaking process for the establishment of replacement standards, NHTSA will exercise its enforcement authority with regard to all existing CAFE and MDHD standards in accordance with the interpretation set forth in th[e] rule." 90 Fed. Reg. at 24,526. The record, meanwhile, is silent on the Suspension Decision and NHTSA's reasons for it. Thus, NHTSA's only justification for the Suspension Decision was that it planned to promulgate replacement standards at some future date.

But NHTSA's bare intent to amend standards through future notice-and-comment rulemaking is far from a reasoned justification for suspending all enforcement in the interim. *See NRDC*, 894 F.3d at 111–12. NHTSA did not (as it must) "explain why the existing program could not have continued while the agency sought to implement" its new

33

interpretation of EPCA. *Steed*, 733 F.2d at 102; *see Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses."). Nor did NHTSA consider the tradeoffs inherent in suspending all enforcement, such as the costs to human health and welfare from its action, as well as the uncertainty that non-enforcement creates for vehicle manufacturers. *See DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (agency action is arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" (quotation marks omitted)).

The Suspension Decision is also arbitrary and capricious because NHTSA nowhere acknowledges, let alone considers, the serious reliance interests of vehicle manufacturers on continued administration of the program. Vehicle manufacturers rely on federal fuel economy standards when designing, manufacturing, and marketing their vehicles. Because the automotive industry operates on three- to five-year project plans, vehicle manufacturers depend on advance notice from NHTSA before federal fuel economy standards (or their enforcement) changes. Indeed, EPCA reflects that need for advance notice, requiring NHTSA to

prescribe fuel economy standards "[a]t least 18 months before the beginning of each model year." 49 U.S.C. § 32902(a). Those reliance interests are even more acute for electric vehicle manufacturers, who negotiate valuable contracts for tradeable compliance credits in reliance on NHTSA's fuel economy standards. *See supra* at 6, 12–13.

The Suspension Decision is highly destabilizing for ZETA's members. Applying its unlawful Suspension Decision, NHTSA has refused to process compliance notifications. *See supra* at 24–25. As a result, manufacturers have not yet received the credits that they have already earned for outperforming applicable fuel economy standards in past model years. Until those credits are added to their accounts, electric vehicle manufacturers cannot finalize millions of dollars in already-negotiated transactions to trade those credits to other manufacturers. *See supra* at 13. This is a textbook case of arbitrary-and-capricious action because NHTSA "ignore[d] such matters" altogether. *Regents of the Univ. of Calif.*, 591 U.S. at 30 (quotation marks omitted). The decision failed to consider how electric vehicle manufacturers had relied on existing fuel economy standards in designing their businesses and generating valuable credits, or how suspending those standards would disrupt the

credits market and interfere with already-negotiated transactions. For those reasons, this Court should vacate the Suspension Decision as arbitrary and capricious in violation of the APA.

### E.  NHTSA cannot defend its abdication of its statutory responsibilities as a nonfinal exercise of enforcement discretion.

NHTSA cannot avoid this conclusion by claiming the Suspension Decision is a nonfinal, unreviewable exercise of enforcement discretion. The Suspension Decision reflects NHTSA's conclusive view on the continuing force of the fuel economy standards: its purpose and effect are to suspend enforcement of the fuel economy standards while NHTSA reconsiders them.

The Suspension Decision is final action. It both "consummat[es]" NHTSA's decisionmaking process and "determine[s]" "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation omitted). *See also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) (deeming a decision final where the agency's "own behavior . . . belies [any] claim that its interpretation is not final"). The decision definitively states that, effective immediately, NHTSA "will exercise its enforcement authority with regard to all existing CAFE and MDHD

standards in accordance with the interpretation set forth in this rule." 90 Fed. Reg. at 24,526; *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) ("[U]se of 'will' indicates [a] statement is in fact a binding norm."). The Suspension Decision thus obligates NHTSA to withhold its authority to enforce the law—and, conversely, it grants manufacturers the right to ignore existing law without any action to restrain violations.

Further, the Suspension Decision is not "immune from judicial review" simply because NHTSA styled it as a "decision not to take enforcement action." *Heckler*, 470 U.S. at 832. To be sure, courts cannot review case-by-case enforcement decisions, which concern questions such as: "whether a violation has occurred, . . . whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action . . . best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831. But the Suspension Decision is not "a 'single-shot nonenforcement decision.'" *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (citation omitted).

Rather, the Suspension Decision is a general, nationwide policy of

37

non-enforcement. In other words, NHTSA "'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilit[y]" to uphold and implement a validly issued regulation. *Heckler*, 470 U.S. at 833 n.4; *see id.* at 839 (Brennan, J., concurring) (noting the importance of judicial review of an agency's "refus[al] to enforce a regulation lawfully promulgated and still in effect"). The Suspension Decision—which was included as part of an "interpretive rule" published by the "Office of Rulemaking" at NHTSA— is intended to have uniform, nationwide application. 90 Fed. Reg. at 24,518. By its own terms, it applies to "all existing CAFE and MDHD standards" and all those subject to such standards. *Id.* at 24,526. It thus "purport[s] to speak to a broad class of parties" and "delineat[es] the boundary between enforcement and non-enforcement"—it announces to all that nothing shall be enforced. *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 677 (D.C. Cir. 1994). Further, it "present[s] a clear[ ] (and . . . easily reviewable) statement of [NHTSA's] reasons"—albeit woefully inadequate ones—for non-enforcement. *Id.* For all those reasons, the Suspension Decision is reviewable. *See OSG Bulk Ships*, 132 F.3d at 812 ("[A]n agency's adoption of a general enforcement policy is

subject to review.").

### F.  As a remedy, this Court should retain jurisdiction to ensure NHTSA resumes administration of the fuel economy program.

As a remedy to NHTSA's disregard of its duties under EPCA and EPCA's implementing regulations, this Court should hold unlawful and vacate the Suspension Decision. *See* 5 U.S.C. § 706. But, because NHTSA's unlawful final action—the Suspension Decision—is implemented by inaction, this Court must ensure that NHTSA does not continue its unlawful conduct by simply refusing to process compliance reports. To that end, the Court should also retain jurisdiction and require NHTSA to provide regular progress reports on the steps it has taken to resume administration of the program.

This Court has "broad equitable powers," including the "substantial ability to order that relief which is necessary to cure the [agency's] legal transgressions" and to "vindicat[e] plaintiffs' rights." *Cobell v. Norton*, 240 F.3d 1081, 1108–09 (D.C. Cir. 2001) (citation omitted). Exercising those broad remedial powers, "federal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations, and have the authority to compel regular progress reports in the meantime." *Id.* at

1109 (collecting cases). *See also, e.g., N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997) (retaining jurisdiction pending agency's compliance with court's mandate).

Retaining jurisdiction is "particularly appropriate" here as "there is a record of agency recalcitrance and resistance to the fulfillment of its legal duties." *Cobell*, 240 F.3d at 1109. After all, even before the Suspension Decision, NHTSA had delayed administration of the federal fuel economy program. As a result of that resistance to timely administering its statutory and regulatory responsibilities, NHTSA is now three years behind on processing compliance notifications for the CAFE program, and seven years behind for the MDHD program. *See supra* at 13–14.

Alternatively, if the Court prefers not to retain jurisdiction, the Court may compel NHTSA to resume enforcement of federal fuel economy standards, because the Suspension Decision unreasonably delays processing compliance reports. *See* 5 U.S.C. § 706(1) (courts may "compel agency action . . . unreasonably delayed"); *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*) (listing factors for assessing a claim of unreasonable delay); *Towns of Wellesley,*

40

*Concord & Norwood v. FERC*, 829 F.2d 275 (1st Cir. 1987) (applying *TRAC*). It is manifestly unreasonable for NHTSA to stop administration of binding standards when it has already delayed processing of compliance reports by up to seven years—especially given Congress instructed NHTSA to process end-of-year reports after each and every model year.[7] This Court's intervention is therefore necessary to ensure NHTSA upholds its statutory responsibilities.

## CONCLUSION

For the foregoing reasons, this Court should hold unlawful and vacate the Suspension Decision, and order appropriate relief to ensure compliance with the vacatur.

---

[7] *See* Nevers Decl. ¶¶ 10–11; Ramanathan Decl. ¶¶ 9–10. *See also, e.g.*, *Fams. for Freedom v. Napolitano*, 628 F. Supp. 2d 535, 540–41 (S.D.N.Y. 2009) (two-and-a-half-year delay unreasonable); *Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983) (three-year delay unreasonable). NHTSA's delay is especially egregious because ultimately, "human health and welfare are at stake." *TRAC*, 750 F.2d at 80; *see NRDC*, 894 F.3d at 105 (fuel economy standards reduce harmful emissions and thereby avert adverse health effects). NHTSA's delays are further unreasonable because they result in intolerable prejudice to electric vehicle manufacturers, *see supra* at 12–14, 35–36, and NHTSA has cited no "higher or competing priority" that would justify inaction, *TRAC*, 750 F.2d at 80.

November 12, 2025                    Respectfully submitted,

                                     */s/ Meghan E. Greenfield*

                                     Meghan E. Greenfield
                                     mgreenfield@jenner.com
                                     Elizabeth H. Starr
                                     estarr@jenner.com
                                     Jenner & Block LLP
                                     1099 New York Avenue NW
                                     Suite 900
                                     Washington, DC 20001
                                     (202) 639-6000

*Counsel for Petitioner Zero Emission Transportation Association*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7), I certify that the foregoing brief has been prepared in Microsoft Word using 14-point Century Schoolbook typeface and is double-spaced (except for headings, footnotes, and block quotations). I further certify that the text is proportionally spaced and contains 7,569 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). Microsoft Word was used to compute the word count.


November 12, 2025                    /s/ *Meghan E. Greenfield*

                                     Meghan E. Greenfield
                                     mgreenfield@jenner.com
                                     Jenner & Block LLP
                                     1099 New York Avenue NW
                                     Suite 900
                                     Washington, DC 20001
                                     (202) 639-6000

## CERTIFICATE OF SERVICE

I certify that, on November 12, 2025, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

November 12, 2025                    /s/ *Meghan E. Greenfield*

                                                 Meghan E. Greenfield
mgreenfield@jenner.com
Jenner & Block LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

**ADDENDUM**

# INDEX

*Resetting the Corporate Average Fuel Economy Program*, 90
   Fed. Reg. 24,518 (June 11, 2025) ................................................. Add. 1

42 U.S.C. § 6201.................................................................... Add. 11

49 U.S.C. § 32901.................................................................. Add. 11

49 U.S.C. § 32902.................................................................. Add. 16

49 U.S.C. § 32903.................................................................. Add. 22

49 U.S.C. § 32904.................................................................. Add. 25

49 U.S.C. § 32909.................................................................. Add. 30

49 U.S.C. § 32911.................................................................. Add. 31

40 C.F.R. § 600.514-12.......................................................... Add. 32

49 C.F.R. § 1.95(a) (excerpt)................................................... Add. 34

49 C.F.R. § 535.7(a) (excerpt)................................................. Add. 34

49 C.F.R. § 535.9.................................................................. Add. 42

49 C.F.R. § 536.5.................................................................. Add. 52

49 C.F.R. § 536.8.................................................................. Add. 56

49 C.F.R. § 553.13................................................................ Add. 58

cause for making this technical correction final without prior proposal and opportunity for comment because such notice and opportunity for comment is unnecessary as the technical correction is for minor typographical, non-substantive errors only.

*Correction*

### PART 1090 [CORRECTED]

In FR Doc. 2024–31218 appearing at 90 FR 4320 in the **Federal Register** of Wednesday, January 15, 2025, the following correction is made:

### § 1090.1355    [Corrected]

■ 1. On page 4361, in the third column, in § 1090.1355, in Equation 1 to paragraph (a), ''RVP = 0.946 .$P_{total}$ − 0.347'' is corrected to read:
''RVP = 0.956 • $P_{total}$ − 0.347''.

**Abigale Tardif,**
*Principal Deputy Assistant Administrator, Office of Air and Radiation.*
[FR Doc. 2025–10528 Filed 6–10–25; 8:45 am]
**BILLING CODE 6560–50–P**

---

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 73

**[MB Docket No. 25–108; RM–11998; DA 25–373; FR ID 293660]**

### Television Broadcasting Services; Hazard, Kentucky; Correction

**AGENCY:** Federal Communications Commission.
**ACTION:** Final rule; correction.

**SUMMARY:** The Federal Communications Commission published a document in the **Federal Register** of May 5, 2025, concerning a rulemaking filed by Gray Television Licensee, LLC, licensee of WYMT–TV, Hazard, Kentucky, requesting substitution of channel 12 for channel 20 at Hazard in the Table of TV Allotments. The document contained the incorrect state in the title.

**DATES:** June 11, 2025.
**FOR FURTHER INFORMATION CONTACT:** Emily Harrison, Media Bureau, at *Emily.Harrison@fcc.gov*, (202) 418–1665, or Mark Colombo, Media Bureau, at Mark. *Colombo@fcc.gov*, (202) 418–7611.

**SUPPLEMENTARY INFORMATION:**

*Correction*

In rule FR Doc. 2025–07755, in the **Federal Register** of May 5, 2025, on page 18928, in the first column, correct the title caption to read:

### Television Broadcasting Services; Hazard, Kentucky

Dated: May 5, 2025.
Federal Communications Commission.
**Thomas Horan,**
*Chief of Staff, Media Bureau.*
[FR Doc. 2025–10604 Filed 6–10–25; 8:45 am]
**BILLING CODE 6712–01–P**

---

## DEPARTMENT OF TRANSPORTATION

### National Highway Traffic Safety Administration

### 49 CFR Parts 531, 533, and 535

**[Docket No. NHTSA–2025–0055]**

### Resetting the Corporate Average Fuel Economy Program

**AGENCY:** National Highway Traffic Safety Administration (NHTSA), Department of Transportation (DOT).
**ACTION:** Interpretive rule.

**SUMMARY:** The National Highway Traffic Safety Administration is issuing this interpretive rule to set forth the agency's interpretation of the factors the agency is prohibited by law from considering when setting maximum feasible fuel economy standards under the Energy Policy and Conservation Act of 1975, the Energy Independence and Security Act of 2007, and other applicable law. This rule describes NHTSA's interpretation of its authority to establish the necessary legal foundation for bringing the Corporate Average Fuel Economy (CAFE) program into compliance with relevant statutory requirements. The rule also describes NHTSA's interpretation of its authority for a commercial medium- and heavy-duty (MDHD) on-highway vehicle and work truck fuel efficiency improvement program, also establishing the necessary legal foundation for bringing that program into compliance with the law. Pending the rulemaking process for the establishment of replacement standards, NHTSA will exercise its enforcement authority with regard to all existing CAFE and MDHD standards in accordance with the interpretation set forth in this rule.

**DATES:** This interpretive rule is applicable as of June 11, 2025.
**FOR FURTHER INFORMATION CONTACT:** For technical and policy issues, Joseph Bayer, CAFE Program Division Chief, Office of Rulemaking, National Highway Traffic Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590; email: *joseph.bayer@dot.gov*; phone: (202) 366–1810. For legal issues,

Hannah Fish, NHTSA Office of the Chief Counsel, National Highway Traffic Safety Administration, 1200 New Jersey Avenue SE, Washington, DC 20590; email: *hannah.fish@dot.gov*.

**SUPPLEMENTARY INFORMATION:** The National Highway Traffic Safety Administration (NHTSA) is issuing this interpretation as the foundation for resetting its Corporate Average Fuel Economy (CAFE) [1] and medium- and heavy-duty fuel efficiency (MDHD) programs as authorized by law. In accordance with the President's Executive Order, *Unleashing American Energy,* and the Secretary's Memorandum, *Fixing the CAFE Program,* NHTSA is in the process of reviewing and reconsidering fuel economy standards applicable to vehicles produced from model year (MY) 2022 forward. [2] NHTSA is also reviewing the existing MDHD standards, including those standards for heavy-duty pickup trucks and vans referenced in the Secretary's Memorandum. NHTSA will apply this interpretation to ensure any changes to these standards and standards set in the future comply with the law, including the legal prohibition on considering dedicated alternative and dual-fueled vehicles and credit trading when setting CAFE standards. [3]

### I. Background

The Energy Policy and Conservation Act of 1975 (EPCA), as amended by the Energy Independence and Security Act of 2007 (EISA), directs the Secretary of Transportation—and NHTSA by delegation—to prescribe average fuel economy standards for the United States passenger automobile and non-passenger automobile fleets, separately, for each model year at the maximum feasible average fuel economy level. [4] Passenger automobiles are those that the Secretary decides by regulation are manufactured primarily for transporting not more than ten individuals, but do not include automobiles that the Secretary decides by regulation have a significant feature designed for off-highway operation and are 4-wheel

---

[1] NHTSA's light-duty program for automobiles. *See, e.g.,* 49 U.S.C. 32902(b)(1)(A)–(B).
[2] Unleashing American Energy, Executive Order 14154 of January 20, 2025, 90 FR 8353 (Jan. 29, 2025); Memorandum from the Secretary of Transportation to Office of the Administrator of the National Highway Traffic Safety Administration (NHTSA), Office of the Assistant Secretary for Policy (OST–P) and Office of the General Counsel (OGC) (Jan. 28, 2025), *available at https:// www.transportation.gov/sites/dot.gov/files/2025-01/ Signed%20Secretarial%20Memo%20re%20 Fixing%20the%20CAFE%20Program.pdf.*
[3] *See* 49 U.S.C. 32902(h).
[4] 49 U.S.C. 32902(b)(2)(B); 49 CFR 1.95.

drive automobiles or are rated at more than 6,000 pounds gross vehicle weight.[5] Non-passenger automobiles are defined as not passenger automobiles or work trucks.[6] Thus, by elimination, non-passenger automobiles are, in general, those that are not primarily for transporting individuals and those that have significant features designed for off-highway operation. Non-passenger automobiles are also referred to as light trucks.

NHTSA also is required to prescribe fuel economy standards for "work trucks and commercial medium-duty or heavy-duty on-highway vehicles."[7] NHTSA is required to "determine in a rulemaking proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement."[8]

When deciding what levels of fuel economy are "maximum feasible," the statute states that NHTSA "shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy."[9] When carrying out its statutory directive to set fuel economy standards at the maximum feasible level, NHTSA must not consider the fuel economy of dedicated automobiles; must consider dual-fueled automobiles to be operated only on gasoline or diesel fuel; and must not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903.[10] A dedicated automobile is one "that operates only on alternative fuel," which includes, among others, fuels such as methanol, hydrogen, electricity, or "any other fuel the Secretary of Transportation prescribes by regulation that is not substantially petroleum and that would yield substantial energy security and environmental benefits."[11] Non-exhaustive examples of dedicated automobiles include electric vehicles (EVs) when powered solely by electricity, natural gas vehicles (NGVs), and other similar vehicles including fuel-cell electric vehicles (FCEVs) powered by hydrogen and powered propane vehicles. A dual-fueled automobile is, among other requirements, "capable of operating on

alternative fuel . . . and on gasoline or diesel fuel,"[12] and includes plug-in hybrid electric vehicles (PHEVs) that can be powered in a "gasoline only" mode (charge-sustaining mode) or with a mix of electricity and gasoline (charge-depleting mode), or "flex-fuel vehicles" (FFVs) that can operate on gasoline or a high-ethanol blend.

Finally, 49 U.S.C. 32902(h) prohibits NHTSA from considering the trading, transferring, or availability of credits under section 32903. The credits in section 32903 are those that manufacturers earn when their CAFE compliance value exceeds their CAFE standard.[13] Manufacturers can apply these "overcompliance" credits up to three years before and five years after the model year in which the credits are earned;[14] they can transfer these credits between their own passenger and non-passenger automobile fleets,[15] subject to statutory restrictions;[16] and trade these credits to other manufacturers under a program established by NHTSA pursuant to discretionary statutory authority, again subject to certain statutory restrictions.[17]

These three limitations—referred to herein as section 32902(h) limitations or factors for their location in the United States Code at 49 U.S.C. 32902(h)—are the primary focus of this interpretive rule. In this interpretive rule, NHTSA affirms that the agency cannot consider the section 32902(h) factors for any purpose and at any point in the process of setting fuel economy standards. NHTSA also examines other aspects of the agency's CAFE and MDHD programs to ensure that both programs are compliant with the law.

*a. Congress Prohibited NHTSA's Consideration of the Section 32902(h) Factors in Standard-Setting*

EPCA was passed in the context of the Arab oil embargoes of the 1970s when American consumers and the U.S. economy were threatened by gasoline shortages and high fuel prices. The House report accompanying the legislation noted that, as a result, the legislation sought to address the national security dangers of America's dependence on foreign oil.[18] Consistent

with that context, the House report stated that the purpose of the CAFE program was to induce automakers into offering America's consumers more fuel-efficient vehicle options to advance the national goal of conserving energy while simultaneously "recogniz[ing] that the automobile industry has a central role in our national economy and that any regulatory program must be carefully drafted so as to require of the industry what is attainable without either imposing impossible burdens on it or unduly limiting consumer choice as to capacity and performance of motor vehicles."[19]

As originally enacted, EPCA did not limit the Secretary's consideration of factors when setting maximum feasible standards. Limitations in section 32902(h) first appeared in the Alternative Motor Fuels Act of 1988 (AMFA).[20] AMFA aimed to displace energy derived from imported oil to help achieve energy security and improve air quality by encouraging the development of widespread use of methanol, ethanol, and natural gas as transportation fuels by consumers and the production of methanol, ethanol, and natural gas-powered motor vehicles. The statute specified that, in carrying out responsibilities to set maximum feasible fuel economy standards, "the Secretary shall not consider the fuel economy of alcohol powered automobiles or natural gas powered automobiles, and the Secretary shall consider dual energy automobiles and natural gas dual energy automobiles to be operated exclusively on gasoline or diesel fuel."[21] One member of Congress described AMFA's approach as "evenhanded" in that the bill did not favor one alternative fuel over another; rather, "it allow[ed] the market to pick the non-petroleum alternative fuel of the future."[22]

The conferees specifically noted their intent to ensure that the Secretary of Transportation did not erase the AMFA

---

[5] 49 U.S.C. 32901(a)(18).
[6] 49 U.S.C. 32901(a)(17).
[7] 49 U.S.C. 32902(b)(1)(C).
[8] 49 U.S.C. 32902(k)(2).
[9] 49 U.S.C. 32902(f).
[10] 49 U.S.C. 32902(h).
[11] 49 U.S.C. 32901(a)(1).

[12] 49 U.S.C. 32901(a)(9).
[13] 49 U.S.C. 32903.
[14] 49 U.S.C. 32903(a).
[15] 49 U.S.C. 32903(g).
[16] 49 U.S.C. 32903(g)(3), (4).
[17] 49 U.S.C. 32903(f).
[18] *See, e.g.,* H.R. Rep. No. 94–340, at 6–10, 87–88 (1975) (available in the docket for this action) ("In 1973 the embargo affected 14 percent of U.S. petroleum consumption and precipitated a $10- to $20-billion drop in GNP. . . . In June of 1973 the average selling price for regular gasoline was

reported to be approximately 38.8 cents per gallon, including tax. By June of 1974 that price had increased to 55.1 cents per gallon, an addition in excess of 42 percent. Yet in the same period, gasoline demand went from 6.8 million barrels per day to 7.0 million barrels per day. In other words, gasoline demand actually increased by 2.9 percent even though prices had jumped by over 42 percent. . . . Part B of title V of the bill establishes a long range program for improving automobile fuel economy by requiring manufacturers and importers to meet increasingly stringent average fuel economy standards, and to disclose the fuel economy of each new automobile sold in the United States.").
[19] *Id.* at 87.
[20] Alternative Motor Fuels Act of 1988, Public Law 100–494 (1988).
[21] *Id.* at 102 STAT. 2450.
[22] 134 Cong. Rec. H25122 (Sept. 23, 1988) (statement of Rep. Sharp).

**24520**    **Federal Register** / Vol. 90, No. 111 / Wednesday, June 11, 2025 / Rules and Regulations

incentives by setting the CAFE standards for passenger or non-passenger automobiles "at a level that assumes a certain penetration of alternative fueled vehicles." [23] Specifically, "i[t] is intended that [NHTSA's maximum feasibility] examination will be conducted without regard to the penetration of alternative fuel vehicles in any manufacturer's fleet, in order to ensure that manufacturers taking advantage of the incentives offered by this bill do not then find DOT including those incentive increases in the manufacturer's 'maximum fuel economy capability.'" [24]

The Energy Policy Act of 1992 expanded the section 32902(h) limitations to include all dedicated alternative-fueled vehicles.[25] The Energy Policy Act's accompanying House report acknowledged that the widespread use of alternative fuels faced several problems, but expanded the AMFA requirements to keep the program "fuel neutral." [26] This was because "all the data, experience, and knowledge gathered concerning alternative fuels over the past two decades points to the fact that no one fuel is 'the winner.'" [27]

There have been no subsequent substantive changes to the language in 49 U.S.C. 32902(h),[28] including with the enactment of EISA in 2007. The statutory prohibition was clear at the time of enactment and has remained clear: it is impermissible for NHTSA to consider the fuel economy of dedicated automobiles in setting maximum feasible fuel economy standards.

*b. Statutory Requirement for MDHD Standards*

NHTSA is required to also prescribe average fuel economy standards for work trucks and commercial medium-duty or heavy-duty on-highway vehicles in accordance with 49 U.S.C. 32902(k).[29] In subsection (k), the statute specifically requires NHTSA "to determine in a rulemaking proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement," and to "adopt and implement appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible." [30] NHTSA's civil penalty authorities for violations of the agency's fuel economy standards also do not include a civil penalty for violations of the MDHD standards.[31]

*c. Presidential Executive Orders and the Secretary of Transportation's Memorandum on Fixing the CAFE Program*

On January 20, 2025, the President issued several Executive Orders, with two in particular pertaining to NHTSA's fuel economy program and directly relevant to this action. Executive Order 14148, *Initial Rescission of Harmful Executive Orders and Actions,* revoked various Executive orders issued by the previous administration, including several that directed NHTSA to reconsider the fuel economy standards finalized in 2020.[32] Executive Order 14154, *Unleashing American Energy,* announced the Administration's policy regarding energy resources, specifically to promote the production, distribution, and use of reliable domestic energy supplies, including oil, natural gas, and biofuels; to ensure that all regulatory requirements related to energy are "grounded in clearly applicable law;" and "to eliminate the 'electric vehicle (EV) mandate' and promote true consumer choice." [33] The Order directed that the United States do this by "removing regulatory barriers to motor vehicle access; by ensuring a level regulatory playing field for consumer choice in vehicles; by terminating, where appropriate, state emissions waivers that function to limit sales of gasoline-powered automobiles; and by considering the elimination of unfair subsidies and other ill-conceived government-imposed market distortions that favor EVs over other technologies and effectively mandate their purchase by individuals, private businesses, and government entities alike by rendering other types of vehicles unaffordable." [34]

On January 28, 2025, the Secretary of Transportation issued a memorandum, titled *Fixing the CAFE Program,* stating that there is "strong reason to conclude that the [2022 and 2024 final rule] CAFE standards promulgated by NHTSA are contrary to Administration policy as reflected in President Trump's Executive Orders and are inconsistent with the substantive statutory requirements applicable to the CAFE program enacted by Congress and codified in chapter 329 of title 49, United States Code." [35] The memorandum directed NHTSA, accordingly, to "commence an immediate review and reconsideration of all existing fuel economy standards applicable to all models of motor vehicles produced from model year 2022 forward, including in particular the rules titled *Corporate Average Fuel Economy Standards for Model Years 2024–2026 Passenger Cars and Light Trucks* (87 FR 25710) and *Corporate Average Fuel Economy Standards for Passenger Cars and Light Trucks for*

---

[23] *Id.* at 25124 (statement of Rep. Dingell).

[24] *Id.*

[25] Energy Policy Act of 1992, Public Law 102–486 (1992) ("Title V of the Motor Vehicle Information and Cost Savings Act (15 U.S.C. 2001 *et seq.*) is amended . . . in section 502(e)—(A) by striking "alcohol powered automobiles or natural gas powered" and inserting in lieu thereof "dedicated").

[26] H.R. Rep. No. 102–474, at 35 (1992).

[27] *Id.*

[28] In 1994, Congress restated the laws related to transportation in one comprehensive title in the recodification of title 49 of the United States Code, *see* S. Rep. No. 103–265 (1994); H.R. Rep. No. 103–180 (1993). The recodification, which was enacted to restate without substantive change all transportation laws in one title, substituted simple language for "awkward and obsolete terms," and eliminated superseded, executed, and obsolete laws. The standard changes made uniformly throughout the revised section are explained in a report preceding the law. Important for this interpretation, "the words 'may not' are used in a prohibitory sense, as 'is not authorized to' and 'is not permitted to.'"

[29] Public Law 110–140 (2007), 121 Stat. 1499 (codified at 49 U.S.C. 32902(b)(1)(C)].

[30] 49 U.S.C. 32902(k)(2).

[31] The Energy Independence and Security Act of 2007 (EISA), Public Law 110–140 (2007), 121 Stat. 1499, amended the civil penalty provision of NHTSA's fuel economy statute to add a provision addressing the use of civil penalties for research and development, but it did not include a civil penalty for MDHD standards. *See* 121 Stat. 1508 (codified at 49 U.S.C. 32912(e)). EISA also included a civil penalty for violations of a tire fuel efficiency information program. *Id.* at 1507.

[32] 90 FR 8237 (Jan. 28, 2025). Among others, Executive Order 14148 rescinded Executive Order 14008 of January 27, 2021 (*Tackling the Climate Crisis at Home and Abroad*) (instituting a whole-of-government effort to reduce carbon dioxide emissions); Executive Order 14037 of August 5, 2021 (*Strengthening American Leadership in Clean Cars and Trucks*) ("setting a goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles" and directing the Secretary of Transportation to set fuel economy standards accordingly); Executive Order 14057 of December 8, 2021 (*Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability*) (promoting government procurement of electric vehicles); Executive Order 14082 of September 12, 2022 (*Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022*) (applying incentives for production and sale of electric vehicles); Executive Order 14094 of April 6, 2023 (*Modernizing Regulatory Review*) (directing use of modified cost-benefit

analysis that inflates the estimated long-term benefits of carbon-reduction regulations, such as higher CAFE standards).

[33] 90 FR 8353 (Jan. 29, 2025).

[34] *Id.*

[35] Memorandum from the Secretary of Transportation to Office of the Administrator of the National Highway Traffic Safety Administration (NHTSA), Office of the Assistant Secretary for Policy (OST–P) and Office of the General Counsel (OGC) (Jan. 28, 2025), available at *https://www.transportation.gov/sites/dot.gov/files/2025-01/Signed%20Secretarial%20Memo%20re%20Fixing%20the%20CAFE%20Program.pdf.*

Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond (89 FR 52540)." [36] Furthermore, the Secretary directed NHTSA, at the earliest opportunity, to "propose the rescission or replacement of any fuel economy standards as determined necessary to bring the CAFE program into compliance with Administration policy and the requirements of the law." [37]

After the President and Secretary's initial direction on reconsidering the CAFE program, the President issued Executive Order 14219, *Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative.*[38] That Executive Order directed agencies, among other things, to identify regulations that are "based on anything other than the best reading of the underlying statutory authority or prohibition" and work with White House offices and personnel to rescind or modify these regulations, as appropriate.[39] That Order also directed agencies, when proposing new regulations, to take account of specific factors related to law or Administration policy laid out in the order,[40] such as whether the regulation is based on the best reading of the underlying statutory authority or prohibition.

In accordance with direction from the President and the Secretary of Transportation, and pursuant to NHTSA's authority under Chapter 329 of Title 49, the agency is issuing this interpretive rule to affirm that the agency cannot consider the section 32902(h) factors for any purpose and at any point in the process of setting fuel economy standards. Not only does the plain text of the statute make clear that NHTSA's prior consideration of the section 32902(h) limitations was inconsistent with the substantive statutory requirements applicable to the CAFE program, but the legislative history affirms this interpretation as well. In this interpretative rule, NHTSA also addresses the statutory provisions applicable to the MDHD program, including the absence of a civil penalty for violations of standards established under that program. This interpretation provides the foundation for subsequent fuel economy standards rulemakings to reset the CAFE program to implement the President and Secretary's directives on CAFE, to reset the MDHD program,

and to ensure that future regulatory actions are consistent with the agency's underlying statutory authority and specific prohibitions in the law.

## II. Interpretation of Statutory Limitations in 49 U.S.C. 32902(h) as Applied to NHTSA's Standard-Setting Analysis

Since the beginning of the CAFE program in the late 1970s, NHTSA has evaluated vehicle manufacturers' ability to comply with different levels of CAFE standards by, among other things, performing an analysis that evaluates a cost-effective pathway for manufacturers to apply fuel-economy-improving technologies to their vehicles.[41] More recently, NHTSA has used the CAFE Compliance and Effects Model (commonly referred to as "the CAFE Model") to perform this analysis. NHTSA uses the model as a tool to estimate how manufacturers could attempt to comply with a given CAFE standard by adding technology to anticipated vehicle fleets and to estimate the impacts of additional technology application. NHTSA also uses the model to evaluate the sensitivity of these estimated outcomes to key analytical inputs (*e.g.,* fuel prices), and to perform probabilistic uncertainty analysis. While the analytical results are used to inform the maximum feasible determination,[42] the analytical results do not *dictate* the maximum feasible determination.[43] It is ultimately up to the agency to balance the available information regarding technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on

fuel economy, and the need of the United States to conserve energy—whether from the technical and economic analysis or other legally appropriate considerations—to set maximum feasible CAFE standards.

In the 2012, 2020, 2022, and 2024 final rules, NHTSA took the position that it could account for the factors prohibited from consideration in section 32902(h) by using a narrow construction of that provision. This narrow interpretation permitted dedicated alternative and dual-fueled vehicles to be added to an existing reference fleet of vehicles [44] in response to reasons other than NHTSA's CAFE standards,[45] and outside of the years for which NHTSA was setting standards.[46] NHTSA prohibited the consideration of dedicated or dual-fueled vehicles only as a compliance option in response to the agency's fuel economy standards during "standard-setting" years (*i.e.,* the model years being evaluated as the subject of the active rulemaking), and similarly prohibited consideration of manufacturers' use of compliance credits only during the standard-setting years. In other words, the model did not apply dedicated or dual-fueled technology to a manufacturer's fleet of vehicles when simulating a cost-effective pathway for the manufacturer to comply with a given level of CAFE standards only in standard-setting years, but application of the technology was otherwise permitted.

---

[36] *Id.*

[37] *Id.*

[38] 90 FR 10583 (Feb. 25, 2025).

[39] *Id.* at Sec. 2(iii) and 2(d).

[40] *Id.* at Sec 4.

[41] *See, e.g.,* Rulemaking Support Paper Concerning the 1981–1984 Passenger Auto Average Fuel Economy Standards (July 1977).

[42] *See, e.g., Pub. Citizen* v. *Nat'l Highway Traffic Safety Admin.,* 848 F.2d 256 (D.C. Cir. 1988).

[43] *See, e.g.,* 85 FR 24174, at 24227 (April 30, 2020) ("As explained elsewhere in this document and as made repeatedly clear over the past several rulemakings, the CAFE model (or, for that matter, any model) neither sets standards nor dictates where and how to set standards; it simply informs as to the potential effects of setting different levels of standards."); 89 FR 52540, at 52855 (June 24, 2024) ("We underscore again that the modeling analysis does not dictate the "answer," it is merely one source of information among others that aids NHTSA's balancing of the standards."). As an example, an non-exhaustive list of modeled estimated impacts of manufacturers adding fuel-economy-improving technology to vehicles could include technology penetration rates, per-vehicle increases in technology costs, fuel savings to the consumer, or total fuel savings by the entire fleet manufactured in a given model year. It is then up to NHTSA to balance these results within the framework of the 49 U.S.C. 32902(f) factors, *e.g.,* total fleetwide fuel savings and per-vehicle increases might be two relevant metrics to explore across alternatives as NHTSA considers how heavily to weigh "the need of the United States to conserve energy" against "economic practicability."

[44] NHTSA's "reference fleet" is a snapshot of an existing U.S. vehicle fleet in a particular model year. NHTSA uses its CAFE compliance data and publicly available manufacturer materials to capture vehicle technologies that already exist in the fleet as a starting point from which to measure further potential technology application.

[45] In accordance with Executive Order 12866 of September 30, 1993 (58 FR 51735) and OMB Circular A–4 (September 17, 2003), to evaluate properly the benefits and costs of regulations and their alternatives, agencies must identify a "no action" baseline: what the world will be like if the proposed rule is not adopted.

[46] Based on the nature of NHTSA's analysis and CAFE rulemaking cycles, NHTSA's reference fleet often precedes the first year for which the agency is setting standards by a handful of years. As an example, in the 2020 final rule, NHTSA used a MY 2017 reference fleet for a standard-setting analysis that covered MYs 2021–2026; similarly, in the 2024 final rule, NHTSA used a MY 2022 reference fleet for a standard-setting analysis that covered MYs 2027–2031. This means that the CAFE Model must "walk up" the reference fleet in years prior to the standard-setting years to the latest year prior to the first standard-setting year; continuing the example from above, in the 2020 final rule the CAFE Model added technology to the MY 2017 fleet from MYs 2018–2020, prior to the first year of standard-setting, which was MY 2021. In addition, NHTSA's analysis also considers explicitly years beyond standard-setting years, because the effects of a fleet of vehicles subject to a particular year's CAFE standards will have effects over the full useful lives of those vehicles.

However, NHTSA's prior consideration of the factors prohibited in section 32902(h)—even if in response to reasons other than NHTSA's standards and even if in non-standard-setting years—is inconsistent with a plain reading of section 32902(h) and with the most faithful approach to standard-setting in furtherance of the design and purposes of EPCA.

*a. Improper Consideration of Dedicated Alternative Vehicle Fuel Economy*

The text of the statute is unequivocal: section 32902(h) prohibits the Secretary from considering the fuel economy of "dedicated vehicles." Specifically, subsection (h)(1) states that the Secretary "may not consider the fuel economy of dedicated automobiles." This does not mean that NHTSA may consider the fuel economy of dedicated automobiles in certain circumstances or during certain timeframes of the agency's choosing or provided that certain criteria specified by the agency are met. Rather, the prohibition means that NHTSA may not consider the fuel economy of dedicated vehicles in any respect and at any point in the process of setting fuel economy standards. Yet that is precisely what the agency did in promulgating the previous standards.

In prior rules, NHTSA exercised certain analytical options that prevented the CAFE Model from applying dedicated alternative fueled vehicle technologies in standard-setting years beyond those already in the reference fleet. However, NHTSA did not restrict dedicated alternative fueled vehicle application in the model years either before or after the standard-setting years. NHTSA also modeled that manufacturers would apply dedicated alternative fueled vehicle technology in the absence of CAFE standards if that technology recouped fuel savings for the consumer within 30 months.

In the two most recent prior rulemakings, NHTSA also included dedicated alternative fueled vehicle technologies in the analysis by accounting for three policies that would be expected to result in significant continued electrification of the fleet. Specifically, NHTSA accounted for Zero Emission Vehicle (ZEV) mandates applicable in California and the other states that have adopted them;[47] some vehicle manufacturers' voluntary commitments to the state of California to continued annual nationwide reductions of vehicle greenhouse gas

emissions through model year (MY) 2026, with greater rates of electrification than would have been expected under NHTSA's 2020 final rule; and manufacturers' joint responses to previously promulgated fuel economy and greenhouse gas emissions standards, which included dedicated electric vehicles. These decisions meant that NHTSA assumed significant numbers of EVs would continue to be produced regardless of the standards set by the agency, in turn increasing the level of standards that could be considered maximum feasible.

The prior consideration of dedicated vehicles' fuel economy in the agency's analysis sets the floor for what was deemed feasible and therefore made improvements beyond what is achievable by an internal combustion engine fleet seem attainable. The inclusion of EVs inherently impacts the agency's determination of maximum feasible standards because EVs are generally imputed to have significantly higher fuel economy than vehicles with an internal combustion engine.[48] Likely, NHTSA would not have proposed or adopted standards as stringent as the previous standards if NHTSA had not considered the fuel economy of EVs in its modeling analysis. NHTSA reasoned that this was appropriate because "accounting for technology improvements that manufacturers would make even in the absence of CAFE standards allows NHTSA to gain a more accurate understanding of the effects of the final rule."[49] However, the inclusion of dedicated vehicles in NHTSA's previous analysis impacted materially the standards that ultimately were promulgated.

This situation is precisely what the drafters of AMFA were protecting against when imposing limitations on the Secretary's consideration of certain factors when setting maximum feasible standards. As one member of Congress stated specifically: "i[t] is intended that [NHTSA's maximum feasibility] examination will be conducted without regard to the penetration of alternative fuel vehicles in any manufacturer's fleet, in order to ensure that manufacturers taking advantage of the incentives offered by this bill do not then find DOT including those incentive

increases in the manufacturer's 'maximum fuel economy capability.'"[50]

*b. Improper Consideration of Dual-Fueled Vehicle Fuel Economy*

Section 32902(h)(2) requires NHTSA to consider "dual fueled automobiles to be operated only on gasoline or diesel fuel." Accordingly, NHTSA must consider PHEVs' fuel economy only when running on gasoline or diesel fuel, *i.e.,* in charge-sustaining mode, not their fuel economy when also running on electricity, *i.e.,* charge-depleting mode. Yet NHTSA expressly considered the fuel economy of PHEVs factoring in their operation using electricity in previous rulemakings, failing to comply faithfully with section 39202(h)(2)'s prohibition.

NHTSA's application of dual-fueled vehicle technology has evolved continuously over successive standard-setting analyses but failed to adhere to the section 32902(h) prohibition each time. In the 2012 final rule, NHTSA interpreted section 32905 ("Manufacturing incentives for alternative fuel vehicles") to authorize consideration of PHEVs' electric fuel economy post-model year 2019,[51] reasoning that the expiration of the statutory credit in 2019 would somehow render section 32902(h)(2)'s prohibition "moot."[52] NHTSA believed that "i[t] would be an unreasonable result if the phase-out of the credit meant that manufacturers would be effectively penalized, in CAFE compliance, for building dual-fueled automobiles like plug-in hybrid electric vehicles, which may be important 'bridge' vehicles in helping consumers move toward full electric vehicles."[53]

NHTSA's reasoning does not explain how the expiration of a statutory incentive would allow the agency to consider the PHEV's electric fuel economy in formulating CAFE standards after model year 2019 when the statute expressly prohibits NHTSA from considering PHEV electric fuel economy in formulating CAFE standards, without caveat or exception. In addition, section 32902(h)(2) has never been repealed, and repeals by

---

[47] 42 U.S.C. 7507. Other states have adopted California's ZEV program requirements under Section 177 of the Clean Air Act (so-called "Section 177 states").

[48] Fuel economy for EVs is determined using a petroleum equivalency factor (PEF) set by the Department of Energy. For example, one EV manufacturer had a fuel economy performance of 739.9 and 751.9 miles per gallon for its MY 2020 domestic passenger and light truck fleets as compared to the 43.4 and 30.2 miles per gallon overall performance of the same fleets for all manufacturers.

[49] 89 FR 52540, at 52611 (June 24, 2024).

[50] 134 Cong. Rec. H25124 (Sept. 23, 1988) (statement of Rep. Dingell).

[51] *See* 49 U.S.C. 32905(b), (f); 77 FR 62624, at 63127–28. That provision created "m[a]nufacturing incentives for alternative fuel automobiles" manufactured from MYs 1993 to 2019 by directing the Environmental Protection Agency (EPA) to use a formula that enhanced the fuel economy of dual-fueled vehicles above what they could obtain on gasoline for the limited purpose of calculating compliance with fuel economy standards.

[52] 77 FR 62624, at 63020 (Oct. 15, 2012).

[53] *Id.*

implication are not favored.[54] Moreover, despite several cross-references to other provisions, section 32902(h)(2) does not mention or cross-reference the manufacturing incentives in section 32905 of the statute, nor does it reference credits at all. Congress knows precisely how to sunset provisions and must do so expressly.[55] Indeed, Congress has included express sunset provisions in other sections of the fuel economy statute (sections 32905(b) and 32906(a)), and there is no sunset provision in Section 32902(h)(2). As a result, section 32902(h)(2)'s prohibition on considering the electric fuel economy of PHEVs remains in force. Unlike other subsections of section 32902, which specify the application of certain provisions to certain model years, section 32902(h) does not have limited applicability.[56]

NHTSA carried its interpretation through the 2020 and 2022 final rule analyses but has since reconsidered this issue and determined that doing so was based on an erroneous reading of the statute, separate from the 2012 rule logic relating to how to give effect to both section 32902(h) and section 32905.[57][58] The agency now explicitly repudiates both prior approaches.

Most recently, the 2024 final rule analysis considered PHEV fuel economy only when operated in charge sustaining mode during standard-setting years but considered PHEV fuel economy when operating in charge depleting mode in the years before and after the standards.[59] In addition, NHTSA allowed PHEV technology application

for the same reasons as the dedicated alternative fueled vehicle technology application, *i.e.,* outside of the standard-setting years or for reasons other than in direct response to NHTSA's CAFE standards, including for the same reasons that the model could apply dedicated alternative fueled vehicle technology, discussed above. This consideration also goes too far. The statutory text of section 32902(h)(2), which states that NHTSA "shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel" does not mean that NHTSA may consider dual-fueled automobiles to be operated by electricity or other fuel in certain circumstances or during certain timeframes of the agency's choosing, or provided that certain criteria specified by the agency are met. The prohibition means that NHTSA may not consider the fuel economy of dual-fueled automobiles operated by electricity or other fuel in any respect and at any point in the process of setting fuel economy standards. NHTSA's decisions to do otherwise increased the level of average fuel economy standards for each fleet in the baseline, making higher standards appear more feasible.

### c. Improper Consideration of Compliance Credits

NHTSA cannot consider compliance credits that manufacturers earn by exceeding the CAFE standards and then use to achieve compliance in years in which their measured average fuel economy falls below the standards. Section 32902(h)(3) provides that the agency "may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903." However, the agency expressly considered compliance credits in setting the previous standards.[60]

NHTSA estimated the state of vehicle manufacturers' credit banks prior to the standard-setting years, simulating the use of credits as a means of compliance with previously promulgated standards.[61] The CAFE Model included a setting to establish a "last year to

consider credits," set at the last year prior to the standard-setting years. NHTSA explained that this allowed the model to "replicate the practical application of existing credits toward compliance in the early years but also to examine the impact of proposed standards based solely on fuel economy improvements in all years for which new standards are being considered."[62] This consideration, however, allowed NHTSA to underestimate manufacturer costs to comply with standards by assuming that manufacturers could use credit application as a means of baseline compliance, rather than by paying civil penalties or by applying additional fuel-economy-improving technology.

NHTSA has taken the position in the past that section 32902(h)(3) extends only to "model years for which the agency is establishing maximum feasible standards" in a particular rulemaking.[63] Upon further consideration, however, NHTSA concludes that that interpretation does not reflect the most faithful application of the statute, which prohibits the agency's taking into account compliance credits in setting fuel economy standards.[64] The statute does not grant NHTSA discretion to consider compliance credits in any manner—as with the section 32902(h)(1) and section 32902(h)(2) criteria discussed above, section 32902(h)(3) does not allow NHTSA to consider credit trading in certain circumstances or during certain timeframes of the agency's choosing, or provided that certain criteria specified by the agency are met. The prohibition means that NHTSA may not consider credit trading in any respect and at any point in the process of setting fuel economy standards.[65] By creating an exception where the statute does not provide one, the agency deviated from the requirements of section 32902(h)(3).[66]

Congress's grant of authority to NHTSA to set maximum feasible fuel economy standards specifies that the fuel economy standards established by the agency must be feasible and practicable for gas-powered vehicles without regard to any reliance on non-gas-powered alternatives or compliance credits. Automakers remain, of course, free to produce dedicated and dual

---

[54] *Posadas* v. *Nat'l City Bank of N.Y.,* 296 U.S. 497, 503 (1936).

[55] *See HollyFrontier Cheyenne Refin., LLC* v. *Renewable Fuels Ass'n,* 141 S. Ct. 2172, 2180 (2021).

[56] *See* 49 U.S.C. 32902(b)(2).

[57] Specifically, in the 2020 and 2022 final rules, the agency failed to account for Congress's 2014 amendment that provided a method for calculating the fuel economy of electric dual-fueled automobiles manufactured after model year 2015, by carrying forward the 2012 final rule reasoning without change. Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015, Public Law 113–291, § 318, 128 Stat. 3292, 3341–3342 (2014).

[58] USCA Case #22–1080, Document #1991134, at 91 (filed March 21, 2023).

[59] *See, e.g.,* 89 FR 52540, at 52634–35 (June 24, 2024) ("Unlike with other technologies in the analysis, including other electrification technologies, Congress placed specific limitations on how we consider the fuel economy of alternative fueled vehicles (such as PHEVs, [battery electric vehicles (BEVs)], and [fuel cell electric vehicles FCEVs]) when setting CAFE standards. We implement these restrictions in the CAFE Model by using fuel economy values that assume "charge sustaining" (gasoline-only) PHEV operation, and by restricting technologies that convert a vehicle to a BEV or a FCEV from being applied during "standard-setting" years.").

[60] *See* 87 FR 25710, at 25747, 25778–79 (May 2, 2022); 89 FR 52540, at 52598 (June 24, 2024).

[61] *See, e.g.,* 85 FR 24174, at 24309 (April 30, 2020). Note that the CAFE Model has never simulated the ability to trade credits between manufacturers but can simulate the strategic accumulation and application of compliance credits, as well as the ability to transfer credits between fleets to improve the compliance position of a less efficient fleet by leveraging credits earned by a more efficient fleet. The model prefers to hold on to earned compliance credits within a given fleet, carrying them forward into the future to offset potential future deficits. This assumption is consistent with observed strategic manufacturer behavior dating back to 2009.

[62] *See, e.g., id.* at 24307.

[63] 85 FR 25710, at 25778 (May 2, 2022).

[64] *See* American Heritage Dictionary 313 (2d ed. 1985) (defining "consider" to mean "take into account").

[65] *Cf. United States* v. *Palomar-Santiago,* 593 U.S. 321, 325–26 (2021); *Ass'n of Civilian Technicians* v. *FLRA,* 22 F.3d 1150, 1153 (D.C. Cir. 1994).

[66] *See Lomax* v. *Ortiz-Marquez,* 140 S. Ct. 1721, 1725 (2020).

alternative fueled vehicles like electric vehicles and plug-in hybrid electric vehicles in response to market demand. However, as the statute and legislative history make clear, NHTSA cannot, in any respect and at any point in the process, consider these elements when setting fuel economy standards.

### III. CAFE Program Regulations Based on the Best Reading of the Underlying Statute Would Minimize Market Distortion

Consistent with the President's directive to identify classes of regulations that are based on anything other than the best reading of the underlying statutory authority or prohibition,[67] and pursuant to NHTSA's own statutory and delegated authority, the agency will consider in the upcoming rulemaking various CAFE program provisions to ensure that its interpretation of the statute results in regulations that are consistent with the statutory text. In particular, the agency has identified CAFE program regulations not explicitly required by EPCA and EISA that run counter to the purpose and intent of both statutes, and that have likely induced reactions in the market that impact producers and consumers without effectuating Congress' intent to insulate the U.S. from major disruptions in the global oil market. These reactions include major non-market-based changes in automobile designs and the introduction of fundamental alterations in their production processes not primarily driven by market demand.

As one example, NHTSA's prior interpretation of the section 32902(h) factors in standard-setting has had secondary effects that the agency intends to address in its subsequent standard-setting rulemaking. NHTSA has determined that credit trading between manufacturers has become necessary in recent years due to standards that are unattainable by manufacturers with diversified powertrain technologies. By creating standards that are feasible without considering dedicated or dual fueled vehicle technologies or the use of compliance credits, distortions are minimized. The availability of credits is uncertain, and eliminating reliance on credit trading as a compliance option would help verify that the standards established by NHTSA are achievable by manufacturers. Thus, the agency is considering whether credit trading

between manufacturers, as authorized but not required by 49 U.S.C. 32903(f), should be retained. The agency does not intend to impact automakers' ability to transfer earned credits between different categories of vehicles in their fleets, including between their passenger car and non-passenger car fleets, as prescribed by statute.

As another example, NHTSA will examine in its future rulemaking how its regulations at 49 CFR 523.5, *Non-passenger automobile,* effectuate the definitions in 49 U.S.C. 32901. Importantly, NHTSA will investigate and seek comment on how its regulatory definitions may have caused, if any, shifts in the type and characteristics of vehicles offered in the market that otherwise may not have occurred. In the 2010 and 2012 final rules, NHTSA reconsidered its vehicle classification regulations but ultimately concluded to monitor and revisit them in future rulemakings. Notably, NHTSA stated that "no one can predict with certainty how the market will change between now and 2025" specifically regarding how vehicle manufacturers may "make more deliberate redesign efforts to move vehicles out of the car fleet and into the truck fleet in order to obtain the lower target." [68] As it is now 2025, NHTSA plans to update agency analysis using actual data. As both the agency and stakeholders have previously noted (as in the 2012 final rule for example), revisiting the vehicle classification regulations would likely need to be accompanied by changes to the shapes of the footprint curves or the stringency of the standards to ensure the standards still reflect maximum feasibility for the adjusted fleets.[69] To the extent that such changes in the aggregate effectuate the best reading of the statute and prevent unnecessary market distortion, NHTSA believes that investigating its vehicle classification regulations is a necessary undertaking. NHTSA will examine the data it now has in considering any reconsideration.

NHTSA will consider whether to reconsider or repeal any other market-distorting incentives it identifies in the standard-setting rulemaking following this interpretive rule. Specifically, NHTSA will evaluate applicable

technology-specific incentives and analyze their impacts for the future rulemaking.

### IV. Interpretation of Statutory Authority and Requirements Applicable to the MDHD Program

Section 32902(b)(1)(C) requires NHTSA to prescribe "average fuel economy standards for . . . work trucks and commercial medium-duty and heavy-duty on-highway vehicles in accordance with subsection (k)," and subsection (k) requires a "fuel efficiency improvement program designed to achieve the maximum feasible improvement." [70] Section 32902(f) sets forth the specific parameters that NHTSA is to consider in establishing "maximum feasible" standards or improvements: "[w]hen deciding maximum feasible average fuel economy under this section, the Secretary of Transportation shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." Despite this statutory enunciation of the specific factors NHTSA is to consider in rulemaking involving a determination of "maximum feasible" fuel economy, NHTSA did not apply the section 32902(f) factors when setting MDHD standards.[71] This failure to apply expressly applicable statutory criteria merits reconsideration of the MDHD standards.

In addition, in establishing the MDHD program in 2011, NHTSA created a non-statutory civil penalty scheme that it lacked the statutory authority to promulgate.[72] NHTSA asserted that the ability to set "compliance and enforcement protocols" provided in subsection (k) enabled it to establish,

---

[67] Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative, Executive Order 14219 of Feb. 19, 2025, 90 FR 10583 (Feb. 25, 2025).

[68] 77 FR 62624, at 63122.

[69] *Id.* at 63123 ("One important point to note in the comparative analysis in the MYs 2012–2016 rulemaking is that, due to time constraints, the agency did not attempt to refit the respective fleet target curves or to change the intended required stringency in MY 2016 of 34.1 mpg for the combined fleets. If we had refitted curves, considering the vehicles in question, we might have obtained a somewhat steeper passenger car curve, and a somewhat flatter light truck curve, which could have affected the agency's findings.").

[70] 49 U.S.C. 32902(b)(1)(C), (k).

[71] 76 FR 57112 (Sept. 15, 2011) ("Congress emphasized that the test methods, measurement metrics, standards, and compliance and enforcement protocols must all be appropriate, cost-effective, and technologically feasible for commercial medium-duty and heavy-duty on-highway vehicles and work trucks. NHTSA notes that these criteria are different from the 'four factors' of 49 U.S.C. 32902(f) that have long governed NHTSA's setting of fuel economy standards for passenger cars and light trucks, although many of the same issues are considered under each of these provisions.") (footnote omitted). NHTSA does not explain in the 2011 rule why the requirement for standards that are "appropriate, cost-effective, and technologically feasible" and "designed to achieve the maximum feasible improvement" in subsection (k) means that NHTSA can disregard the requirement in subsection (f) that NHTSA must consider the four enumerated factors in developing standards.

[72] *See* 76 FR 57106 (Sept. 15, 2011) (adopting civil penalty of up to $37,500 per vehicle or engine in 49 CFR 535.9).

through regulation, a civil penalty of its choosing.[73] NHTSA did not argue that the civil penalties in 49 U.S.C. 32912 apply,[74] and NHTSA continues to believe that section 32912 does not provide authority for civil penalties for work trucks and commercial medium-duty or heavy-duty on-highway vehicles subject to MDHD standards.

Section 32912 establishes civil penalties both for violations of CAFE standards and for other violations of 49 U.S.C. chapter 329.[75] The general penalty in 49 U.S.C. 32912(a) of up to $10,000 per violation expressly excludes violations of standards prescribed under section 32902.[76] The civil penalty for violations of standards prescribed under section 32902 is set forth in section 32912(b). While both CAFE and MDHD fuel economy standards are prescribed under section 32902,[77] the civil penalty applicable to violations of CAFE standards does not apply to MDHD standards because it is calculated by reference to "automobiles."[78] "Automobiles" are vehicles subject to CAFE standards, and are distinct from "work trucks and commercial medium-duty or heavy-duty on highway vehicles" subject to MDHD standards.[79] Thus, the only civil penalties established in chapter 329 plainly do not apply to violations of MDHD standards.

In the absence of an applicable statutory civil penalty, NHTSA adopted a civil penalty equal to that in the Clean Air Act, a statute that does not confer authority on NHTSA and that it does not administer.[80] NHTSA reasoned it could "fill gaps" left by Congress and

that Congress intended a penalty despite not actually adopting one in the statute.[81] As noted above, however, Congress did amend the civil penalty provision of the fuel economy statute at the same time as it required NHTSA to set MDHD standards and adopted penalties for other violations of law, but Congress did not adopt a penalty for violations of MDHD standards.[82] NHTSA has reconsidered this issue and determined that because NHTSA has not been statutorily authorized to impose civil penalties for violations of MDHD standards, NHTSA's civil penalty scheme adopted by regulation—currently up to $51,668 per vehicle or engine—is unauthorized.[83]

NHTSA also established a credit program for the MDHD program that allows for transfers and trading. Contrasted with the detailed statutory provision that enables manufacturers to earn credits in the CAFE program, permits NHTSA to establish a credit trading program, and constrains the use of credits, the statute does not even mention credits in the rulemaking mandate for the MDHD program from which NHTSA claimed vast discretion, but instead contains only an ambiguous reference to "compliance and enforcement protocols."[84] NHTSA has reconsidered its authority to establish credit trading for the MDHD program and determined that Congress knew how to authorize NHTSA to establish a credit trading program and provide specific direction to NHTSA regarding how to establish a credit trading program, and did not do so in authorizing NHTSA to establish "compliance and enforcement protocols."

NHTSA also considered credits and EVs, resulting in more stringent MDHD standards, without express authority to do so and in contrast with the explicit limitations applicable to the CAFE program in section 32902(h) on these issues.[85]

NHTSA will engage in rulemaking to reconsider the standards established for the MDHD program and other aspects of the program consistent with the

interpretations set forth in this interpretive rule.

## V. Next Steps in Resetting the CAFE Program and Enforcement Considerations

All Americans are harmed by CAFE-imposed price increases, but those most harmed are lower-income Americans who cannot afford to buy an EV or to pay more for a gas-powered vehicle. As the Secretary stated, "[a]rtificially high fuel economy standards designed to meet non-statutory policy goals, such as those NHTSA has promulgated in recent years, impose large costs that render many new vehicle models unaffordable for the average American family and small business owner."[86] The Secretary explained that these regulatory costs, market distortions from technology-specific incentives, and pressures on automakers result in more Americans driving older used vehicles, "which statistics show are much less safe in a highway crash. Thus, there is reason to be concerned these standards will actually increase the number of fatalities and serious injuries occurring each year on America's roadways—an unacceptable outcome that is contrary to NHTSA's mission of advancing highway traffic safety for all Americans."[87]

With respect to the MDHD program, which is explicitly for commercial vehicles, a reset is also necessary to ensure appropriate regulation consistent with law. Reevaluation of this program is necessary to ensure that the agency's MDHD program is lawful and does not result in market distortions. Commercial purchasers are well aware of their own fuel economy needs. Their purchases of MDHD vehicles are informed business decisions that occur in a highly competitive and self-regulating market. Government intervention in excess of statutory requirements and authority interferes with the efficient functioning of this market.

NHTSA believes that the interpretation set forth in this rule appropriately clarifies the scope of its authority related to setting maximum feasible CAFE standards and with respect to the MDHD program. This interpretation does not, itself, change existing CAFE or MDHD standards or any rights or obligations under the CAFE or MDHD programs. Instead, this interpretation lays the appropriate groundwork for standard-setting rulemakings that will reset the agency's regulatory programs as determined necessary to bring them into compliance

---

[73] *See id.* at 57132–33 ("NHTSA continues to believe that it is reasonable to interpret 'compliance and enforcement protocols' to include authority to impose civil penalties . . . . NHTSA believes that if Congress had intended for a predetermined penalty scheme to apply to the new HD program, it would have been specific.").

[74] *See id.* at 57133 ("NHTSA believes that Section 32912 does not apply to the new HD program . . . .").

[75] 49 U.S.C. 32912(a)–(b).

[76] *See id.* at 32912(a) ("A person that violates section 32911(a) of this title is liable to the United States Government for a civil penalty of not more than $10,000 for each violation."); 32911(a) ("A person commits a violation if the person fails to comply with this chapter and regulations and standards prescribed and orders issued under this chapter (except sections 32902, 32903, 32908(b), 32917(b), and 32918 and regulations and standards prescribed and orders issued under those sections).").

[77] *Id.* at 32902(b).

[78] *Id.* 32912(b).

[79] *Compare id.* 32901(a)(3) (defining "automobile"), *with* (a)(7), (19) (defining "commercial medium- and heavy-duty on-highway vehicle" and "work truck"); *see also id.* 32912(b) (requirements to set CAFE standards and MDHD standards).

[80] 76 FR 56132–33 (Sept. 15, 2011).

[81] *See id.*

[82] *See* 121 Stat. 1508–08 (adopting civil penalty of up to $50,000 per violation for tire fuel efficiency information program and adding provision addressing use of civil penalties for research and development to 49 U.S.C. 32912).

[83] *See* 49 CFR 535.9(b); 578.6(i).

[84] *Compare* 49 U.S.C. 32903 *with* 49 U.S.C. 32902(k)(2).

[85] *See* 76 FR 57129 (Sept. 15, 2011). While the limitations on considering credits and EVs in 49 U.S.C. 32902(h) do not apply to the MDHD program, the broad authority claimed by the agency raises legal concerns that merit reconsideration in future rulemaking.

[86] Fixing the CAFE Program Secretarial Memorandum, at 2–3.

[87] *Id.* at 3.

**24526** Federal Register / Vol. 90, No. 111 / Wednesday, June 11, 2025 / Rules and Regulations

with Administration policy and applicable substantive statutory requirements as enacted by Congress and codified in chapter 329 of title 49 of the United States Code.

In light of the legal interpretation set forth in this interpretive rule, NHTSA will reset the CAFE and MDHD standards programs consistent with the law. Pending the rulemaking process for the establishment of replacement standards, NHTSA will exercise its enforcement authority with regard to all existing CAFE and MDHD standards in accordance with the interpretation set forth in this rule.

**Regulatory Analyses**

NHTSA has examined this interpretive rule in accordance with the requirements of Executive Order 12866, Regulatory Planning and Review; Executive Order 13563, Improving Regulation and Regulatory Review; Executive Order 14192, Unleashing Prosperity Through Deregulation; Executive Order 14219, Ensuring Lawful Governance and Implementing the President's ''Department of Government Efficiency'' Deregulatory Initiative; Executive Order 13132, Federalism; Executive Order 12988, Civil Justice Reform; Executive Order 13175, Consultation and Coordination with Indian Tribal Governments; the Unfunded Mandates Reform Act of 1995; the Regulatory Flexibility Act of 1980; the Paperwork Reduction Act; the National Environmental Policy Act of 1969; statutes relevant to privacy issues, and the Congressional Review Act.

NHTSA is issuing this interpretive rule to explain the statute the agency administers and how the agency will apply its interpretation to subsequent substantive CAFE and MDHD program rules. This interpretive rule does not amend or alter the meaning of any regulations, and any costs and benefits of any subsequent proposed changes to regulations will be analyzed in forthcoming rules to reset the CAFE and MDHD programs. As such, notice and comment under the Administrative Procedure Act is not required for this interpretive rule, see 5 U.S.C. 553(b)(A), and the rule similarly is not subject to a 30-day delay in effective date, see 5 U.S.C. 553(d)(2).

*A. Executive Order 12866, Regulatory Planning and Review; Executive Order 13563, Improving Regulation and Regulatory Review; Executive Order 14192, Unleashing Prosperity Through Deregulation; and Executive Order 14219, Ensuring Lawful Governance and Implementing the President's ''Department of Government Efficiency'' Deregulatory Initiative*

Executive Order (E.O.) 12866, ''Regulatory Planning and Review'' (58 FR 51735, Oct. 4, 1993), reaffirmed by E.O. 13563, ''Improving Regulation and Regulatory Review'' (76 FR 3821, Jan. 21, 2011), provides for determining whether a regulatory action is ''significant'' and therefore subject to the Office of Management and Budget (OMB) review process and to the requirements of the E.O. This is a ''significant regulatory action'' under section 3(f)(4) of E.O. 12866. Accordingly, NHTSA submitted this action to OMB for review. However, there are no costs or benefits associated with this interpretive rule. Any costs and benefits of the forthcoming rules implementing the interpretation and resetting the CAFE and MDHD programs will be analyzed in those subsequent rulemakings.

E.O. 14192, ''Unleashing Prosperity Through Deregulation'' (90 FR 9065, Feb. 6, 2025) requires an agency, unless prohibited by law, to identify at least ten existing regulations to be repealed when the agency publicly proposes for notice and comment or otherwise promulgates a new regulation. In furtherance of this requirement, section 3(c) of Executive Order 14192 requires that the new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least ten prior regulations. As discussed above, there are no costs or benefits associated with this interpretive rule. However, this interpretive rule, which sets forth NHTSA's interpretation of its statutory authority for the issuance of CAFE and MDHD standards, ensures that, going forward, NHTSA will no longer regulate beyond its statutory authority with respect to the CAFE and MDHD programs. Any costs and benefits of the forthcoming rules implementing the interpretation and resetting the CAFE and MDHD programs will be analyzed in those rulemakings. The subsequent substantive CAFE and MDHD rules could be deregulatory actions that result in significant cost savings.

E.O. 14219, Ensuring Lawful Governance and Implementing the President's ''Department of Government

Efficiency'' Deregulatory Initiative requires agency heads to review their regulations and identify regulations that, among other things, are based on anything other than the best reading of the underlying statutory authority or prohibition, or that implicate matters of social, political, or economic significance that are not authorized by clear statutory authority. As described above, NHTSA has identified its CAFE and MDHD standards as falling within an enumerated category(ies) of E.O. 14219. NHTSA is issuing this interpretive rule to set forth the agency's interpretation of the factors the agency is prohibited by law from considering when setting maximum feasible fuel economy standards. This rule describes NHTSA's interpretation of its authority to establish the necessary legal foundation for bringing the CAFE and MDHD programs into compliance with relevant statutory requirements.

*B. Executive Order 13132, Federalism*

A rule has implications for federalism under section 1(a) of E.O. 13132 if it has ''substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.'' NHTSA has determined that this interpretive rule will not have substantial direct costs on or for States, nor would it limit the policymaking discretion of States. Nothing in this document preempts any State law or regulation. Therefore, this interpretive rule does not have sufficient federalism implications to warrant the preparation of a Federalism Impact Statement.

*C. Executive Order 12988, Civil Justice Reform*

E.O. 12988, ''Civil Justice Reform'' (61 FR 4729, Feb. 7, 1996), requires that agencies promulgating new regulations or reviewing existing regulations take steps to minimize litigation, eliminate ambiguity, and to reduce burdens on the regulated public. NHTSA has reviewed this rule and determined that this action conforms to the applicable standards in sections 3(a) and 3(b)(2) of E.O. 12988, Civil Justice Reform.

*D. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

This interpretive rule does not have Tribal implications under E.O. 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal

Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

### E. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) requires Federal agencies to assess the effects of their discretionary regulatory actions. UMRA addresses actions that may result in the expenditure by a State, local, or Tribal government, in the aggregate, or by the private sector of $206 million (which is the value equivalent of $100 million in 1995, adjusted for inflation to 2024) or more in any 1 year. As discussed above, this interpretive rule by itself results in no expenditures and therefore the analytical requirements of UMRA do not apply. Any costs and benefits will be analyzed in forthcoming rules resetting the CAFE and MDHD programs subject to the principles laid out in this document.

### F. Regulatory Flexibility Act of 1980

The Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.,* requires agencies to prepare a regulatory flexibility analysis for any rule where the agency is required by law to publish a general notice of proposed rulemaking. *See* 5 U.S.C. 603. NHTSA is not required to complete a regulatory flexibility analysis because, as discussed above, this action is not subject to notice and public comment under the Administrative Procedure Act (APA). *See* 5 U.S.C. 553(b)(A).

### G. Paperwork Reduction Act

This interpretive rule contains no new information collection requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).

### H. National Environmental Policy Act of 1969

In accordance with 42 U.S.C. 4336, "[a]n agency is not required to prepare an environmental document with respect to a proposed agency action if the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5 [of the United States Code]. As discussed above, this action is not a final agency action within the meaning of 5 U.S.C. chapter 5. Any environmental effects will be analyzed in forthcoming rules resetting the CAFE and MDHD programs subject to the principles laid out in this document.

### I. Privacy

The Consolidated Appropriations Act, 2005 (Pub. L. 108–447, 118 Stat. 2809, 3268, Dec. 8, 2004 (5 U.S.C. 552a note)), requires certain parties (Federal agencies and any non-Federal entity that receives records contained in a system of records from a Federal agency for use in a matching program) to conduct a privacy impact assessment of a regulation that will affect the privacy of individuals. Because this interpretive rule does not require the collection of personally identifiable information, NHTSA is not required to conduct a privacy impact assessment.

The E-Government Act of 2002 (Pub. L. 107–347, sec. 208, 116 Stat. 2899, 2921, Dec. 17, 2002), requires Federal agencies to conduct a privacy impact assessment for new or substantially changed technology that collects, maintains, or disseminates information in an identifiable form. No new or substantially changed technology will collect, maintain, or disseminate information as a result of this interpretive rule. Accordingly, NHTSA has not conducted a privacy impact assessment.

### J. Congressional Review Act

Pursuant to the Congressional Review Act (CRA) (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as not a "major rule," as defined by 5 U.S.C. 804(2). NHTSA will submit this rule to Congress and the Government Accountability Office as required by the CRA.

Issued in Washington, DC, under authority delegated in 49 CFR 1.95, 501.4, and 501.5.

**Peter Simshauser,**
*Chief Counsel.*

[FR Doc. 2025–10586 Filed 6–10–25; 8:45 am]

**BILLING CODE 4910–59–P**

---

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 622

**[Docket No. 250606–0095]**

**RIN 0648–BN31**

### Snapper-Grouper Fishery of the South Atlantic; Amendment 59

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule.

**SUMMARY:** NMFS issues regulations to implement Amendment 59 to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic (Snapper-Grouper FMP) (Amendment 59). For South Atlantic red snapper, this final rule revises the commercial and recreational annual catch limits (ACLs). Amendment 59 also revises the fishing mortality (F) at maximum sustainable yield (MSY) proxy for determining overfishing, overfishing limit (OFL), acceptable biological catch (ABC), and total ACL and sector ACLs for red snapper. For the 2025 fishing year, this final rule also announces the red snapper commercial and recreational fishing season dates in the South Atlantic. For red snapper, this final rule is intended to end and prevent overfishing and revise the catch limits consistent with the most recent stock assessment.

**DATES:** This final rule is effective July 11, 2025. The 2025 red snapper commercial season opens at 12:01 a.m., local time, July 14, 2025, until 12:01 a.m., local time, January 1, 2026, unless changed by subsequent notification in the **Federal Register**. The 2025 red snapper recreational season opens at 12:01 a.m., local time, on July 11, 2025, and closes at 12:01 a.m., local time, on July 13, 2025.

**ADDRESSES:** Electronic copies of Amendment 59, which includes an environmental assessment (EA), regulatory impact review, a regulatory flexibility analysis (RFA), and the Small Entity Compliance Guide, may be obtained from the Southeast Regional Office website at *https:// www.fisheries.noaa.gov/action/ secretarial-amendment-fishery- management-plan-snapper-grouper- fishery-south-atlantic-region.*

The unique identification number for the Amendment 59 environmental review is: EAXX–006–48–1SE– 1746577008EISX.

**FOR FURTHER INFORMATION CONTACT:** Rick DeVictor, telephone: 727–824–5305, or email: *rick.devictor@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** NMFS, with the advice from and the South Atlantic Fishery Management Council (Council), manages the South Atlantic snapper-grouper fishery, which includes red snapper, in the South Atlantic exclusive economic zone (EEZ) under the Snapper-Grouper FMP. The Snapper-Grouper FMP was prepared by the Council, approved by the Secretary of Commerce (Secretary), and is implemented by NMFS through regulations at 50 CFR part 622 under the authority of the Magnuson-Stevens

## 42 U.S.C. § 6201

### § 6201. Congressional statement of purpose

The purposes of this chapter are--

**(1)** to grant specific authority to the President to fulfill obligations of the United States under the international energy program;

**(2)** to provide for the creation of a Strategic Petroleum Reserve capable of reducing the impact of severe energy supply interruptions;

**(3)** Repealed. Pub. L. 106-469, Title I, § 102(2), Nov. 9, 2000, 114 Stat. 2029;

**(4)** to conserve energy supplies through energy conservation programs, and, where necessary, the regulation of certain energy uses;

**(5)** to provide for improved energy efficiency of motor vehicles, major appliances, and certain other consumer products;

**(6)** Repealed. Pub. L. 106-469, Title I, § 102(2), Nov. 9, 2000, 114 Stat. 2029;

**(7)** to provide a means for verification of energy data to assure the reliability of energy data; and

**(8)** to conserve water by improving the water efficiency of certain plumbing products and appliances.

## 49 U.S.C. § 32901

### § 32901. Definitions

**(a) General.**--In this chapter--

   **(1)** "alternative fuel" means--

      **(A)** methanol;

      **(B)** denatured ethanol;

      **(C)** other alcohols;

      **(D)** except as provided in subsection (b) of this section, a mixture containing at least 85 percent of methanol, denatured ethanol, and other alcohols by volume with gasoline or other fuels;

      **(E)** natural gas;

**Add. 11**

**(F)** liquefied petroleum gas;

**(G)** hydrogen;

**(H)** coal derived liquid fuels;

**(I)** fuels (except alcohol) derived from biological materials;

**(J)** electricity (including electricity from solar energy); and

**(K)** any other fuel the Secretary of Transportation prescribes by regulation that is not substantially petroleum and that would yield substantial energy security and environmental benefits.

**(2)** "alternative fueled automobile" means an automobile that is a--

**(A)** dedicated automobile; or

**(B)** dual fueled automobile.

**(3)** except as provided in section 32908 of this title, "automobile" means a 4-wheeled vehicle that is propelled by fuel, or by alternative fuel, manufactured primarily for use on public streets, roads, and highways and rated at less than 10,000 pounds gross vehicle weight, except--

**(A)** a vehicle operated only on a rail line;

**(B)** a vehicle manufactured in different stages by 2 or more manufacturers, if no intermediate or final-stage manufacturer of that vehicle manufactures more than 10,000 multi-stage vehicles per year; or

**(C)** a work truck.

**(4)** "automobile manufactured by a manufacturer" includes every automobile manufactured by a person that controls, is controlled by, or is under common control with the manufacturer, but does not include an automobile manufactured by the person that is exported not later than 30 days after the end of the model year in which the automobile is manufactured.

**(5)** "average fuel economy" means average fuel economy determined under section 32904 of this title.

**(6)** "average fuel economy standard" means a performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in a model year.

**(7)** "commercial medium- and heavy-duty on-highway vehicle" means an on-highway vehicle with a gross vehicle weight rating of 10,000 pounds or more.

**(8)** "dedicated automobile" means an automobile that operates only on alternative fuel.

**(9)** "dual fueled automobile" means an automobile that--

**(A)** is capable of operating on alternative fuel or a mixture of biodiesel and diesel fuel meeting the standard established by the American Society for Testing and Materials or under section 211(u) of the Clean Air Act (42 U.S.C. 7545(u)) for fuel containing 20 percent biodiesel (commonly known as "B20") and on gasoline or diesel fuel;

**(B)** provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the United States Government, when operating on alternative fuel as when operating on gasoline or diesel fuel;

**(C)** for model years 1993-1995 for an automobile capable of operating on a mixture of an alternative fuel and gasoline or diesel fuel and if the Administrator of the Environmental Protection Agency decides to extend the application of this subclause, for an additional period ending not later than the end of the last model year to which section 32905(b) and (d) of this title applies, provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the Government, when operating on a mixture of alternative fuel and gasoline or diesel fuel containing exactly 50 percent gasoline or diesel fuel as when operating on gasoline or diesel fuel; and

**(D)** for a passenger automobile, meets or exceeds the minimum driving range prescribed under subsection (c) of this section.

**(10)** "fuel" means--

**(A)** gasoline;

**(B)** diesel oil; or

**(C)** other liquid or gaseous fuel that the Secretary decides by regulation to include in this definition as consistent with the need of the United States to conserve energy.

**(11)** "fuel economy" means the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used, as determined by the Administrator under section 32904(c) of this title.

**(12)** "import" means to import into the customs territory of the United States.

**(13)** "manufacture" (except under section 32902(d) of this title) means to produce or assemble in the customs territory of the United States or to import.

**(14)** "manufacturer" means--

    **(A)** a person engaged in the business of manufacturing automobiles, including a predecessor or successor of the person to the extent provided under regulations prescribed by the Secretary; and

    **(B)** if more than one person is the manufacturer of an automobile, the person specified under regulations prescribed by the Secretary.

**(15)** "model" means a class of automobiles as decided by regulation by the Administrator after consulting and coordinating with the Secretary.

**(16)** "model year", when referring to a specific calendar year, means--

    **(A)** the annual production period of a manufacturer, as decided by the Administrator, that includes January 1 of that calendar year; or

    **(B)** that calendar year if the manufacturer does not have an annual production period.

**(17)** "non-passenger automobile" means an automobile that is not a passenger automobile or a work truck.

**(18)** "passenger automobile" means an automobile that the Secretary decides by regulation is manufactured primarily for transporting not more than 10 individuals, but does not include an automobile capable of off-highway operation that the Secretary decides by regulation--

**(A)** has a significant feature (except 4-wheel drive) designed for off-highway operation; and

**(B)** is a 4-wheel drive automobile or is rated at more than 6,000 pounds gross vehicle weight.

**(19)** "work truck" means a vehicle that--

**(A)** is rated at between 8,500 and 10,000 pounds gross vehicle weight; and

**(B)** is not a medium-duty passenger vehicle (as defined in section 86.1803-01 of title 40, Code of Federal Regulations, as in effect on the date of the enactment of the Ten-in-Ten Fuel Economy Act).

**(b) Authority to change percentage.**--The Secretary may prescribe regulations changing the percentage referred to in subsection (a)(1)(D) of this section to not less than 70 percent because of requirements relating to cold start, safety, or vehicle functions.

**(c) Minimum driving ranges for dual fueled passenger automobiles.--(1)** The Secretary shall prescribe by regulation the minimum driving range that dual fueled automobiles that are passenger automobiles must meet when operating on alternative fuel to be dual fueled automobiles under sections 32905 and 32906 of this title. A determination whether a dual fueled automobile meets the minimum driving range requirement under this paragraph shall be based on the combined Agency city/highway fuel economy as determined for average fuel economy purposes for those automobiles.

**(2)(A)** The Secretary may prescribe a lower range for a specific model than that prescribed under paragraph (1) of this subsection. A manufacturer may petition for a lower range than that prescribed under paragraph (1) for a specific model.

**(B)** The minimum driving range prescribed for dual fueled automobiles (except electric automobiles) under subparagraph (A) of this paragraph or paragraph (1) of this subsection must be at least 200 miles, except that beginning with model year 2016, alternative fueled automobiles that use a fuel described in subparagraph (E) of subsection (a)(1) shall have a minimum driving range of 150 miles.

**(C)** If the Secretary prescribes a minimum driving range of 200 miles for dual fueled automobiles (except electric automobiles) under paragraph (1) of this subsection, subparagraph (A) of this paragraph does not apply to dual fueled automobiles (except electric automobiles). Beginning with model year 2016, if the Secretary prescribes a minimum driving range of 150 miles for alternative fueled automobiles that use a fuel described in subparagraph (E) of subsection (a)(1), subparagraph (A) shall not apply to dual fueled automobiles (except electric automobiles).

**(3)** In prescribing a minimum driving range under paragraph (1) of this subsection and in taking an action under paragraph (2) of this subsection, the Secretary shall consider the purpose set forth in section 3 of the Alternative Motor Fuels Act of 1988 (Public Law 100-494, 102 Stat. 2442), consumer acceptability, economic practicability, technology, environmental impact, safety, drivability, performance, and other factors the Secretary considers relevant.

### 49 U.S.C. § 32902

**§ 32902. Average fuel economy standards**

**(a) Prescription of standards by regulation.**--At least 18 months before the beginning of each model year, the Secretary of Transportation shall prescribe by regulation average fuel economy standards for automobiles manufactured by a manufacturer in that model year. Each standard shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year.

**(b) Standards for automobiles and certain other vehicles.--**

**(1) In general.**--The Secretary of Transportation, after consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, shall prescribe separate average fuel economy standards for--

**(A)** passenger automobiles manufactured by manufacturers in each model year beginning with model year 2011 in accordance with this subsection;

**(B)** non-passenger automobiles manufactured by manufacturers in each model year beginning with model year 2011 in accordance with this subsection; and

**(C)** work trucks and commercial medium-duty or heavy-duty on-highway vehicles in accordance with subsection (k).

**(2) Fuel economy standards for automobiles.--**

**(A) Automobile fuel economy average for model years 2011 through 2020.**--The Secretary shall prescribe a separate average fuel economy standard for passenger automobiles and a separate average fuel economy standard for non-passenger automobiles for each model year beginning with model year 2011 to achieve a combined fuel economy average for model year 2020 of at least 35 miles per gallon for the total fleet of passenger and non-passenger automobiles manufactured for sale in the United States for that model year.

**(B) Automobile fuel economy average for model years 2021 through 2030.**--For model years 2021 through 2030, the average fuel economy required to be attained by each fleet of passenger and non-passenger automobiles manufactured for sale in the United States shall be the maximum feasible average fuel economy standard for each fleet for that model year.

**(C) Progress toward standard required.**--In prescribing average fuel economy standards under subparagraph (A), the Secretary shall prescribe annual fuel economy standard increases that increase the applicable average fuel economy standard ratably beginning with model year 2011 and ending with model year 2020.

**(3) Authority of the Secretary.**--The Secretary shall--

**(A)** prescribe by regulation separate average fuel economy standards for passenger and non-passenger automobiles based on 1 or more vehicle attributes related to fuel economy and express each standard in the form of a mathematical function; and

**(B)** issue regulations under this title prescribing average fuel economy standards for at least 1, but not more than 5, model years.

**(4) Minimum standard.**--In addition to any standard prescribed pursuant to paragraph (3), each manufacturer shall also meet the

minimum standard for domestically manufactured passenger automobiles, which shall be the greater of--

**(A)** 27.5 miles per gallon; or

**(B)** 92 percent of the average fuel economy projected by the Secretary for the combined domestic and non-domestic passenger automobile fleets manufactured for sale in the United States by all manufacturers in the model year, which projection shall be published in the Federal Register when the standard for that model year is promulgated in accordance with this section.

**(c) Amending passenger automobile standards.**--The Secretary of Transportation may prescribe regulations amending the standard under subsection (b) of this section for a model year to a level that the Secretary decides is the maximum feasible average fuel economy level for that model year. Section 553 of title 5 applies to a proceeding to amend the standard. However, any interested person may make an oral presentation and a transcript shall be taken of that presentation.

**(d) Exemptions.--(1)** Except as provided in paragraph (3) of this subsection, on application of a manufacturer that manufactured (whether in the United States or not) fewer than 10,000 passenger automobiles in the model year 2 years before the model year for which the application is made, the Secretary of Transportation may exempt by regulation the manufacturer from a standard under subsection (b) or (c) of this section. An exemption for a model year applies only if the manufacturer manufactures (whether in the United States or not) fewer than 10,000 passenger automobiles in the model year. The Secretary may exempt a manufacturer only if the Secretary--

**(A)** finds that the applicable standard under those subsections is more stringent than the maximum feasible average fuel economy level that the manufacturer can achieve; and

**(B)** prescribes by regulation an alternative average fuel economy standard for the passenger automobiles manufactured by the exempted manufacturer that the Secretary decides is the maximum feasible average fuel economy level for the manufacturers to which the alternative standard applies.

**(2)** An alternative average fuel economy standard the Secretary of Transportation prescribes under paragraph (1)(B) of this subsection

may apply to an individually exempted manufacturer, to all automobiles to which this subsection applies, or to classes of passenger automobiles, as defined under regulations of the Secretary, manufactured by exempted manufacturers.

**(3)** Notwithstanding paragraph (1) of this subsection, an importer registered under section 30141(c) of this title may not be exempted as a manufacturer under paragraph (1) for a motor vehicle that the importer--

> **(A)** imports; or

> **(B)** brings into compliance with applicable motor vehicle safety standards prescribed under chapter 301 of this title for an individual under section 30142 of this title.

**(4)** The Secretary of Transportation may prescribe the contents of an application for an exemption.

**(e) Emergency vehicles.--(1)** In this subsection, "emergency vehicle" means an automobile manufactured primarily for use--

> **(A)** as an ambulance or combination ambulance-hearse;

> **(B)** by the United States Government or a State or local government for law enforcement; or

> **(C)** for other emergency uses prescribed by regulation by the Secretary of Transportation.

**(2)** A manufacturer may elect to have the fuel economy of an emergency vehicle excluded in applying a fuel economy standard under subsection (a), (b), (c), or (d) of this section. The election is made by providing written notice to the Secretary of Transportation and to the Administrator of the Environmental Protection Agency.

**(f) Considerations on decisions on maximum feasible average fuel economy.**--When deciding maximum feasible average fuel economy under this section, the Secretary of Transportation shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy.

**(g) Requirements for other amendments.--(1)** The Secretary of Transportation may prescribe regulations amending an average fuel

economy standard prescribed under subsection (a) or (d) of this section if the amended standard meets the requirements of subsection (a) or (d), as appropriate.

**(2)** When the Secretary of Transportation prescribes an amendment under this section that makes an average fuel economy standard more stringent, the Secretary shall prescribe the amendment (and submit the amendment to Congress when required under subsection (c)(2) of this section) at least 18 months before the beginning of the model year to which the amendment applies.

**(h) Limitations.**--In carrying out subsections (c), (f), and (g) of this section, the Secretary of Transportation--

**(1)** may not consider the fuel economy of dedicated automobiles;

**(2)** shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel; and

**(3)** may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903.

**(i) Consultation.**--The Secretary of Transportation shall consult with the Secretary of Energy in carrying out this section and section 32903 of this title.

**(j) Secretary of Energy comments.**--**(1)** Before issuing a notice proposing to prescribe or amend an average fuel economy standard under subsection (a), (c), or (g) of this section, the Secretary of Transportation shall give the Secretary of Energy at least 10 days from the receipt of the notice during which the Secretary of Energy may, if the Secretary of Energy concludes that the proposed standard would adversely affect the conservation goals of the Secretary of Energy, provide written comments to the Secretary of Transportation about the impact of the standard on those goals. To the extent the Secretary of Transportation does not revise a proposed standard to take into account comments of the Secretary of Energy on any adverse impact of the standard, the Secretary of Transportation shall include those comments in the notice.

**(2)** Before taking final action on a standard or an exemption from a standard under this section, the Secretary of Transportation shall notify the Secretary of Energy and provide the Secretary of Energy a reasonable time to comment.

**(k) Commercial medium- and heavy-duty on-highway vehicles and work trucks.--**

**(1) Study.**--Not later than 1 year after the National Academy of Sciences publishes the results of its study under section 108 of the Ten-in-Ten Fuel Economy Act, the Secretary of Transportation, in consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, shall examine the fuel efficiency of commercial medium- and heavy-duty on-highway vehicles and work trucks and determine--

**(A)** the appropriate test procedures and methodologies for measuring the fuel efficiency of such vehicles and work trucks;

**(B)** the appropriate metric for measuring and expressing commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency performance, taking into consideration, among other things, the work performed by such on-highway vehicles and work trucks and types of operations in which they are used;

**(C)** the range of factors, including, without limitation, design, functionality, use, duty cycle, infrastructure, and total overall energy consumption and operating costs that affect commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency; and

**(D)** such other factors and conditions that could have an impact on a program to improve commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency.

**(2) Rulemaking.**--Not later than 24 months after completion of the study required under paragraph (1), the Secretary, in consultation with the Secretary of Energy and the Administrator of the Environmental Protection Agency, by regulation, shall determine in a rulemaking proceeding how to implement a commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency improvement program designed to achieve the maximum feasible improvement, and shall adopt and implement appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible for commercial medium- and heavy-duty on-highway vehicles and work trucks. The Secretary may

prescribe separate standards for different classes of vehicles under this subsection.

**(3) Lead-time; regulatory stability.**--The commercial medium- and heavy-duty on-highway vehicle and work truck fuel economy standard adopted pursuant to this subsection shall provide not less than--

**(A)** 4 full model years of regulatory lead-time; and

**(B)** 3 full model years of regulatory stability.

## 49 U.S.C. § 32903

### § 32903. Credits for exceeding average fuel economy standards

**(a) Earning and period for applying credits.**--When the average fuel economy of passenger automobiles manufactured by a manufacturer in a particular model year exceeds an applicable average fuel economy standard under subsections (a) through (d) of section 32902 (determined by the Secretary of Transportation without regard to credits under this section), the manufacturer earns credits. The credits may be applied to--

**(1)** any of the 3 consecutive model years immediately before the model year for which the credits are earned; and

**(2)** to the extent not used under paragraph (1) any of the 5 consecutive model years immediately after the model year for which the credits are earned.

**(b) Period of availability and plan for future credits.**--(1) Except as provided in paragraph (2) of this subsection, credits under this section are available to a manufacturer at the end of the model year in which earned.

**(2)(A)** Before the end of a model year, if a manufacturer has reason to believe that its average fuel economy for passenger automobiles will be less than the applicable standard for that model year, the manufacturer may submit a plan to the Secretary of Transportation demonstrating that the manufacturer will earn sufficient credits under this section within the next 3 model years to allow the manufacturer to meet that standard for the model year involved. Unless the Secretary finds that the manufacturer is unlikely to earn

**Add. 22**

sufficient credits under the plan, the Secretary shall approve the plan. Those credits are available for the model year involved if--

**(i)** the Secretary approves the plan; and

**(ii)** the manufacturer earns those credits as provided by the plan.

**(B)** If the average fuel economy of a manufacturer is less than the applicable standard under subsections (a) through (d) of section 32902 after applying credits under subsection (a)(1) of this section, the Secretary of Transportation shall notify the manufacturer and give the manufacturer a reasonable time (of at least 60 days) to submit a plan.

**(c) Determining number of credits.**--The number of credits a manufacturer earns under this section equals the product of--

**(1)** the number of tenths of a mile a gallon by which the average fuel economy of the passenger automobiles manufactured by the manufacturer in the model year in which the credits are earned exceeds the applicable average fuel economy standard under subsections (a) through (d) of section 32902; times

**(2)** the number of passenger automobiles manufactured by the manufacturer during that model year.

**(d) Applying credits for passenger automobiles.**--The Secretary of Transportation shall apply credits to a model year on the basis of the number of tenths of a mile a gallon by which the manufacturer involved was below the applicable average fuel economy standard for that model year and the number of passenger automobiles manufactured that model year by the manufacturer. Credits applied to a model year are no longer available for another model year. Before applying credits, the Secretary shall give the manufacturer written notice and reasonable opportunity to comment.

**(e) Applying credits for non-passenger automobiles.**--Credits for a manufacturer of automobiles that are not passenger automobiles are earned and applied to a model year in which the average fuel economy of that class of automobiles is below the applicable average fuel economy standard under section 32902(a) of this title, to the same extent and in the same way as provided in this section for passenger automobiles.

**(f) Credit trading among manufacturers.--**

(1) **In general.**--The Secretary of Transportation may establish, by regulation, a fuel economy credit trading program to allow manufacturers whose automobiles exceed the average fuel economy standards prescribed under section 32902 to earn credits to be sold to manufacturers whose automobiles fail to achieve the prescribed standards such that the total oil savings associated with manufacturers that exceed the prescribed standards are preserved when trading credits to manufacturers that fail to achieve the prescribed standards.

(2) **Limitation.**--The trading of credits by a manufacturer to the category of passenger automobiles manufactured domestically is limited to the extent that the fuel economy level of such automobiles shall comply with the requirements of section 32902(b)(4), without regard to any trading of credits from other manufacturers.

**(g) Credit transferring within a manufacturer's fleet.--**

(1) **In general.**--The Secretary of Transportation shall establish by regulation a fuel economy credit transferring program to allow any manufacturer whose automobiles exceed any of the average fuel economy standards prescribed under section 32902 to transfer the credits earned under this section and to apply such credits within that manufacturer's fleet to a compliance category of automobiles that fails to achieve the prescribed standards.

(2) **Years for which used.**--Credits transferred under this subsection are available to be used in the same model years that the manufacturer could have applied such credits under subsections (a), (b), (d), and (e), as well as for the model year in which the manufacturer earned such credits.

(3) **Maximum increase.**--The maximum increase in any compliance category attributable to transferred credits is--

(A) for model years 2011 through 2013, 1.0 mile per gallon;

(B) for model years 2014 through 2017, 1.5 miles per gallon; and

(C) for model year 2018 and subsequent model years, 2.0 miles per gallon.

(4) **Limitation.**--The transfer of credits by a manufacturer to the category of passenger automobiles manufactured domestically is

limited to the extent that the fuel economy level of such automobiles shall comply with the requirements under section 32904(b)(4), without regard to any transfer of credits from other categories of automobiles described in paragraph (6)(B).

**(5) Years available.**--A credit may be transferred under this subsection only if it is earned after model year 2010.

**(6) Definitions.**--In this subsection:

　**(A) Fleet.**--The term "fleet" means all automobiles manufactured by a manufacturer in a particular model year.

　**(B) Compliance category of automobiles.**--The term "compliance category of automobiles" means any of the following 3 categories of automobiles for which compliance is separately calculated under this chapter:

　　**(i)** Passenger automobiles manufactured domestically.

　　**(ii)** Passenger automobiles not manufactured domestically.

　　**(iii)** Non-passenger automobiles.

**(h) Refund of collected penalty.**--When a civil penalty has been collected under this chapter from a manufacturer that has earned credits under this section, the Secretary of the Treasury shall refund to the manufacturer the amount of the penalty to the extent the penalty is attributable to credits available under this section.

### 49 U.S.C. § 32904

### § 32904. Calculation of average fuel economy

**(a) Method of calculation.**--**(1)** The Administrator of the Environmental Protection Agency shall calculate the average fuel economy of a manufacturer subject to--

　**(A)** section 32902(a) of this title in a way prescribed by the Administrator; and

　**(B)** section 32902(b)-(d) of this title by dividing--

　　**(i)** the number of passenger automobiles manufactured by the manufacturer in a model year; by

**Add. 25**

**(ii)** the sum of the fractions obtained by dividing the number of passenger automobiles of each model manufactured by the manufacturer in that model year by the fuel economy measured for that model.

**(2)(A)** In this paragraph, "electric vehicle" means a vehicle powered primarily by an electric motor drawing electrical current from a portable source.

**(B)** If a manufacturer manufactures an electric vehicle, the Administrator shall include in the calculation of average fuel economy under paragraph (1) of this subsection equivalent petroleum based fuel economy values determined by the Secretary of Energy for various classes of electric vehicles. The Secretary shall review those values each year and determine and propose necessary revisions based on the following factors:

**(i)** the approximate electrical energy efficiency of the vehicle, considering the kind of vehicle and the mission and weight of the vehicle.

**(ii)** the national average electrical generation and transmission efficiencies.

**(iii)** the need of the United States to conserve all forms of energy and the relative scarcity and value to the United States of all fuel used to generate electricity.

**(iv)** the specific patterns of use of electric vehicles compared to petroleum-fueled vehicles.

**(b) Separate calculations for passenger automobiles manufactured domestically and not domestically.--(1)(A)** Except as provided in paragraphs (6) and (7) of this subsection, the Administrator shall make separate calculations under subsection (a)(1)(B) of this section for--

**(i)** passenger automobiles manufactured domestically by a manufacturer (or included in this category under paragraph (5) of this subsection); and

**(ii)** passenger automobiles not manufactured domestically by that manufacturer (or excluded from this category under paragraph (5) of this subsection).

**Add. 26**

**(B)** Passenger automobiles described in subparagraph (A)(i) and (ii) of this paragraph are deemed to be manufactured by separate manufacturers under this chapter, except for the purposes of section 32903.

**(2)** In this subsection (except as provided in paragraph (3)), a passenger automobile is deemed to be manufactured domestically in a model year if at least 75 percent of the cost to the manufacturer is attributable to value added in the United States or Canada, unless the assembly of the automobile is completed in Canada and the automobile is imported into the United States more than 30 days after the end of the model year.

**(3)(A)** In this subsection, a passenger automobile is deemed to be manufactured domestically in a model year, as provided in subparagraph (B) of this paragraph, if at least 75 percent of the cost to the manufacturer is attributable to value added in the United States, Canada, or Mexico, unless the assembly of the automobile is completed in Canada or Mexico and the automobile is imported into the United States more than 30 days after the end of the model year.

**(B)** Subparagraph (A) of this paragraph applies to automobiles manufactured by a manufacturer and sold in the United States, regardless of the place of assembly, as follows:

**(i)** A manufacturer that began assembling automobiles in Mexico before model year 1992 may elect, during the period from January 1, 1997, through January 1, 2004, to have subparagraph (A) of this paragraph apply to all automobiles manufactured by that manufacturer beginning with the model year that begins after the date of the election.

**(ii)** For a manufacturer that began assembling automobiles in Mexico after model year 1991, subparagraph (A) of this paragraph applies to all automobiles manufactured by that manufacturer beginning with the model year that begins after January 1, 1994, or the model year beginning after the date the manufacturer begins assembling automobiles in Mexico, whichever is later.

**(iii)** A manufacturer not described in clause (i) or (ii) of this subparagraph that assembles automobiles in the United States

or Canada, but not in Mexico, may elect, during the period from January 1, 1997, through January 1, 2004, to have subparagraph (A) of this paragraph apply to all automobiles manufactured by that manufacturer beginning with the model year that begins after the date of the election. However, if the manufacturer begins assembling automobiles in Mexico before making an election under this subparagraph, this clause does not apply, and the manufacturer is subject to clause (ii) of this subparagraph.

**(iv)** For a manufacturer that does not assemble automobiles in the United States, Canada, or Mexico, subparagraph (A) of this paragraph applies to all automobiles manufactured by that manufacturer beginning with the model year that begins after January 1, 1994.

**(v)** For a manufacturer described in clause (i) or (iii) of this subparagraph that does not make an election within the specified period, subparagraph (A) of this paragraph applies to all automobiles manufactured by that manufacturer beginning with the model year that begins after January 1, 2004.

**(C)** The Secretary of Transportation shall prescribe reasonable procedures for elections under subparagraph (B) of this paragraph.

**(4)** In this subsection, the fuel economy of a passenger automobile that is not manufactured domestically is deemed to be equal to the average fuel economy of all passenger automobiles manufactured by the same manufacturer that are not manufactured domestically.

**(5)(A)** A manufacturer may submit to the Secretary of Transportation for approval a plan, including supporting material, stating the actions and the deadlines for taking the actions, that will ensure that the model or models referred to in subparagraph (B) of this paragraph will be manufactured domestically before the end of the 4th model year covered by the plan. The Secretary promptly shall consider and act on the plan. The Secretary shall approve the plan unless--

**(i)** the Secretary finds that the plan is inadequate to meet the requirements of this paragraph; or

**(ii)** the manufacturer previously has submitted a plan approved by the Secretary under this paragraph.

Add. 28

**(B)** If the plan is approved, the Administrator shall include under paragraph (1)(A)(i) and exclude under paragraph (1)(A)(ii) of this subsection, for each of the 4 model years covered by the plan, not more than 150,000 passenger automobiles manufactured by that manufacturer but not qualifying as domestically manufactured if--

**(i)** the model or models involved previously have not been manufactured domestically;

**(ii)** at least 50 percent of the cost to the manufacturer of each of the automobiles is attributable to value added in the United States or Canada;

**(iii)** the automobiles, if their assembly was completed in Canada, are imported into the United States not later than 30 days after the end of the model year; and

**(iv)** the model or models are manufactured domestically before the end of the 4th model year covered by the plan.

**(c) Testing and calculation procedures.**--The Administrator shall measure fuel economy for each model and calculate average fuel economy for a manufacturer under testing and calculation procedures prescribed by the Administrator. However, except under section 32908 of this title, the Administrator shall use the same procedures for passenger automobiles the Administrator used for model year 1975 (weighted 55 percent urban cycle and 45 percent highway cycle), or procedures that give comparable results. A measurement of fuel economy or a calculation of average fuel economy (except under section 32908) shall be rounded off to the nearest .1 of a mile a gallon. The Administrator shall decide on the quantity of other fuel that is equivalent to one gallon of gasoline. To the extent practicable, fuel economy tests shall be carried out with emissions tests under section 206 of the Clean Air Act (42 U.S.C. 7525).

**(d) Effective date of procedure or amendment.**--The Administrator shall prescribe a procedure under this section, or an amendment (except a technical or clerical amendment) in a procedure, at least 12 months before the beginning of the model year to which the procedure or amendment applies.

**(e) Reports and consultation.**--The Administrator shall report measurements and calculations under this section to the Secretary of

Transportation and shall consult and coordinate with the Secretary in carrying out this section.

**49 U.S.C. § 32909**

**§ 32909. Judicial review of regulations**

**(a) Filing and venue.--(1)** A person that may be adversely affected by a regulation prescribed in carrying out any of sections 32901-32904 or 32908 of this title may apply for review of the regulation by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.

> **(2)** A person adversely affected by a regulation prescribed under section 32912(c)(1) of this title may apply for review of the regulation by filing a petition for review in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.

**(b) Time for filing and judicial procedures.**--The petition must be filed not later than 59 days after the regulation is prescribed, except that a petition for review of a regulation prescribing an amendment of a standard submitted to Congress under section 32902(c)(2) of this title must be filed not later than 59 days after the end of the 60-day period referred to in section 32902(c)(2). The clerk of the court shall send immediately a copy of the petition to the Secretary of Transportation or the Administrator of the Environmental Protection Agency, whoever prescribed the regulation. The Secretary or the Administrator shall file with the court a record of the proceeding in which the regulation was prescribed.

**(c) Additional proceedings.--(1)** When reviewing a regulation under subsection (a)(1) of this section, the court, on request of the petitioner, may order the Secretary or the Administrator to receive additional submissions if the court is satisfied the additional submissions are material and there were reasonable grounds for not presenting the submissions in the proceeding before the Secretary or Administrator.

**(2)** The Secretary or the Administrator may amend or set aside the regulation, or prescribe a new regulation because of the additional submissions presented. The Secretary or Administrator shall file an amended or new regulation and the additional submissions with the court. The court shall review a changed or new regulation.

**(d) Supreme Court review and additional remedies.**--A judgment of a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28. A remedy under subsections (a)(1) and (c) of this section is in addition to any other remedies provided by law.

## 49 U.S.C. § 32911

### § 32911. Compliance

**(a) General.**--A person commits a violation if the person fails to comply with this chapter and regulations and standards prescribed and orders issued under this chapter (except sections 32902, 32903, 32908(b), 32917(b), and 32918 and regulations and standards prescribed and orders issued under those sections). The Secretary of Transportation shall conduct a proceeding, with an opportunity for a hearing on the record, to decide whether a person has committed a violation. Any interested person may participate in a proceeding under this subsection.

**(b) Automobile manufacturers.**--A manufacturer of automobiles commits a violation if the manufacturer fails to comply with an applicable average fuel economy standard under section 32902 of this title. Compliance is determined after considering credits available to the manufacturer under section 32903 of this title. If average fuel economy calculations under section 32904(c) of this title indicate that a manufacturer has violated this subsection, the Secretary shall conduct a proceeding, with an opportunity for a hearing on the record, to decide whether a violation has been committed. The Secretary may not conduct the proceeding if further measurements of fuel economy, further calculations of average fuel economy, or other information indicates a violation has not been committed. The results of the measurements and calculations and the information shall be published in the Federal Register. Any interested person may participate in a proceeding under this subsection.

**40 C.F.R. § 600.514–12**

## § 600.514–12 Reports to the Environmental Protection Agency.

This section establishes requirements for automobile manufacturers to submit reports to the Environmental Protection Agency regarding their efforts to reduce automotive greenhouse gas emissions.

(a) General Requirements.

(1) For each model year, each manufacturer shall submit a pre-model year report.

(2) The pre-model year report required by this section for each model year must be submitted before the model year begins and before the certification of any test group, no later than December 31 of the calendar year two years before the model year. For example the pre-model year report for the 2012 model year must be submitted no later than December 31, 2010.

(3) Each report required by this section must:

(i) Identify the report as a pre-model year report;

(ii) Identify the manufacturer submitting the report;

(iii) State the full name, title, and address of the official responsible for preparing the report;

(iv) Be submitted to: Director, Compliance and Innovative Strategies Division, U.S. Environmental Protection Agency, 2000 Traverwood, Ann Arbor, Michigan 48105;

(v) Identify the current model year;

(vi) Be written in the English language; and

(vii) Be based upon all information and data available to the manufacturer approximately 30 days before the report is submitted to the Administrator.

(b) Content of pre-model year reports.

(1) Each pre-model year report must include the following information for each compliance category for the applicable future model year and to the extent possible, two model years into the future:

(i) The manufacturer's estimate of its footprint-based fleet average $CO_2$ standards (including temporary lead time allowance alternative standards, if applicable);

(ii) Projected total and model-level production volumes for each applicable standard category;

(iii) Projected fleet average $CO_2$ compliance level for each applicable standard category; and the model-level $CO_2$ emission values which form the basis of the projection;

(iv) Projected fleet average $CO_2$ credit/debit status for each applicable standard category;

(v) A description of the various credit, transfer and trading options that will be used to comply with each applicable standard category, including the amount of credit the manufacturer intends to generate for air conditioning leakage, air conditioning efficiency, off-cycle technology, advanced technology vehicles, hybrid or low-emission full size pickup trucks, and various early credit programs;

(vi) A description of the method which will be used to calculate the carbon-related exhaust emissions for any electric vehicles, fuel cell vehicles and plug-in hybrid vehicles;

(vii) A summary by model year (beginning with the 2009 model year) of the number of electric vehicles, fuel cell vehicles, plug-in hybrid electric vehicles, dedicated compressed natural gas vehicles, and dual fuel natural gas vehicles using (or projected to use) the advanced technology vehicle credit and incentives program, including the projected use of production multipliers;

(viii) The methodology which will be used to comply with $N_2O$ and $CH_4$ emission standards; and

(ix) Notification of the manufacturer's intent to exclude emergency vehicles from the calculation of fleet average standards and the end-of-year fleet average, including a description of the excluded emergency vehicles and the quantity of such vehicles excluded.

(x) Other information requested by the Administrator.

(2) Manufacturers must submit, in the pre-model year report for each model year in which a credit deficit is generated (or projected to be generated), a compliance plan demonstrating how the manufacturer will comply with the fleet average $CO_2$ standard by the end of the third year after the deficit occurred.

**49 C.F.R. § 1.95**

**§ 1.95 Delegations to the National Highway Traffic Safety Administrator.**

The National Highway Traffic Safety Administrator is delegated authority to:

(a) Exercise the authority vested in the Secretary under chapters 301, 303, 321, 323, 325, 327, 329, and 331, of Title 49, U.S.C., except for 49 U.S.C. 32916(b).

* * * *

**49 C.F.R. § 535.7**

**§ 535.7 Averaging, banking, and trading (ABT) credit program.**

(a) General provisions. After the end of each model year, manufacturers must comply with the fuel consumption standards in § 535.5 for averaging, banking and trading credits. Manufacturers comply with standards if the sum of averaged, banked and traded credits generate a "zero" credit balance or a credit surplus within an averaging set of vehicles or engines. Manufacturers fail to comply with standards if the sum of the credit flexibilities generate a credit deficit (or shortfall) in an averaging set. Credit shortfalls must be offset by banked or traded credits within three model years after the shortfall is incurred. These processes are hereafter referenced as the NHTSA ABT credit program. The following provisions apply to all fuel consumption credits.

(1) Credits (or fuel consumption credits (FCCs)). Credits in this part mean a calculated weighted value representing the difference between the fuel consumption performance and the standard of a vehicle or engine family or fleet within a particular averaging set. Positive

credits represent cases where a vehicle or engine family or fleets perform better than the applicable standard (the fuel consumption performance is less than the standard) whereas negative credits represent underperforming cases. The value of a credit is calculated according to paragraphs (b) through (e) of this section. FCCs are only considered earned or useable for averaging, banking or trading after EPA and NHTSA have verified the information in a manufacturer's final reports required in § 535.8. Types of FCCs include the following:

(i) Conventional credits. Credits generated by vehicle or engine families or fleets containing conventional vehicles (i.e., gasoline, diesel and alternative fueled vehicles).

(ii) Early credits. Credits generated by vehicle or engine families or fleets produced for model year 2013. Early credits are multiplied by an incentive factor of 1.5 times.

(iii) Advanced technology credits. Credits generated by vehicle or engine families or subconfigurations containing vehicles with advanced technologies (i.e., hybrids with regenerative braking, vehicles equipped with Rankine-cycle engines, electric and fuel cell vehicles) as described in paragraph (f)(1) of this section.

(iv) Innovative and off-cycle technology credits. Credits can be generated by vehicle or engine families or subconfigurations having fuel consumption reductions resulting from technologies not reflected in the GEM simulation tool or in the Federal Test Procedure (FTP) chassis dynamometer and that were not in common use with heavy-duty vehicles or engines before model year 2010 that are not reflected in the specified test procedure. Manufacturers should prove that these technologies were not in common use in heavy-duty vehicles or engines before model year 2010 by demonstrating factors such as the penetration rates of the technology in the market. NHTSA will not approve any request if it determines that these technologies do not qualify. The approach for determining innovative and off-cycle technology credits under this fuel consumption program is described in paragraph (f)(2) of this section and by the Environmental Protection Agency (EPA) under 40 CFR 86.1819–14(d)(13), 1036.610, and 1037.610. Starting in model year 2030, manufacturers certifying vehicles under §

535.5(a) may not earn off-cycle technology credits under 40 CFR 86.1819–14(d)(13).

(2) Averaging. Averaging is the summing of a manufacturer's positive and negative FCCs for engines or vehicle families or fleets within an averaging set. The principle averaging sets are defined in § 535.4.

(i) A credit surplus occurs when the net sum of the manufacturer's generated credits for engines or vehicle families or fleets within an averaging set is positive (a zero credit balance is when the sum equals zero).

(ii) A credit deficit occurs when the net sum of the manufacturer's generated credits for engines or vehicle families or fleets within an averaging set is negative.

(iii) Positive credits, other than advanced technology credits in Phase 1, generated and calculated within an averaging set may only be used to offset negative credits within the same averaging set.

(iv) Manufacturers may certify one or more vehicle families (or subfamilies) to an FEL above the applicable fuel consumption standard, subject to any applicable FEL caps and other provisions allowed by EPA in 40 CFR parts 1036 and 1037, if the manufacturer shows in its application for certification to EPA that its projected balance of all FCC transactions in that model year is greater than or equal to zero or that a negative balance is allowed by EPA under 40 CFR 1036.745 and 1037.745.

(v) If a manufacturer certifies a vehicle family to an FEL that exceeds the otherwise applicable standard, it must obtain enough FCC to offset the vehicle family's deficit by the due date of its final report required in § 535.8. The emission credits used to address the deficit may come from other vehicle families that generate FCCs in the same model year (or from the next three subsequent model years), from banked FCCs from previous model years, or from FCCs generated in the same or previous model years that it obtained through trading.

(vi) Manufacturers may certify a vehicle or engine family using an FEL (as described in § 535.6) below the fuel consumption standard (as described in § 535.5) and choose not to generate conventional fuel consumption credits for that family. Manufacturers do not need

Add. 36

to calculate fuel consumption credits for those families and do not need to submit or keep the associated records described in § 535.8 for these families. Manufacturers participating in NHTSA's FCC program must provide reports as specified in § 535.8.

(3) Banking. Banking is the retention of surplus FCC in an averaging set by the manufacturer for use in future model years for the purpose of averaging or trading.

(i) Surplus credits may be banked by the manufacturer for use in future model years, or traded, given the restriction that the credits have an expiration date of five model years after the year in which the credits are generated. For example, banked credits earned in model year 2014 may be utilized through model year 2019. Surplus credits will become banked credits unless a manufacturer contacts NHTSA to expire its credits.

(ii) Surplus credits become earned or usable banked FCCs when the manufacturer's final report is approved by both agencies. However, the agencies may revoke these FCCs at any time if they are unable to verify them after reviewing the manufacturer's reports or auditing its records.

(iii) Banked FCC retain the designation from the averaging set and model year in which they were generated.

(iv) Banked credits retain the designation of the averaging set in which they were generated.

(4) Trading. Trading is a transaction that transfers banked family regulatory subcategory or averaging set fuel consumption credits. Tractor, vocational vehicle and engine manufacturers may trade credits generated for vehicle or engine families or subfamilies while manufacturers of heavy-duty pickup trucks and vans certified as complete vehicles may trade credit credits generated for averaging sets. A manufacturer may use traded FCCs for averaging, banking, or further trading transactions.

(i) Manufacturers may only trade banked credits to other manufacturers to use for compliance with fuel consumption standards. Traded FCCs, other than advanced technology credits earned in Phase 1, may be used only within the averaging set in

which they were generated. Manufacturers may only trade credits to other entities for the purpose of expiring credits.

(ii) Advanced technology credits earned in Phase 1 can be traded across different averaging sets.

(iii) The agencies may revoke traded FCCs at any time if they are unable to verify them after reviewing the manufacturer's reports or auditing its records.

(iv) If a negative FCC balance results from a transaction, both the buyer and seller are liable, except in cases the agencies deem to involve fraud. See § 535.9 for cases involving fraud. EPA also may void the certificates of all vehicle families participating in a trade that results in a manufacturer having a negative balance of emission credits. See 40 CFR 1037.745.

(v) [Reserved by 89 FR 18829]

(vi) Manufacturers with deficits or projecting deficits before or during a production model year may not trade credits until its available credits exceed the deficit. Manufacturers with a deficit may not trade credits if the deadline to offset that credit deficit has passed.

(5) Credit deficit (or credit shortfall). A credit shortfall or deficit occurs when the sum of the manufacturer's generated credits for engines or vehicle families or fleets within an averaging set is negative. Credit shortfalls must be offset by an available credit surplus within three model years after the shortfall was incurred. If the shortfall cannot be offset, the manufacturer is liable for civil penalties as discussed in § 535.9.

(6) FCC credit plan.

(i) Each model year manufacturers submit credit plan in their certificates of conformity as required in 40 CFR 1036.725(b)(2) and 40 CFR 1037.725(b)(2). The plan is required to contain equivalent fuel consumption information in accordance § 535.8(c). The plan must include:

(A) Detailed calculations of projected emission and fuel consumption credits (positive or negative) based on projected U.S.-directed production volumes. The agencies may require a

manufacturer to include similar calculations from its other engine or vehicle families to project its net credit balances for the model year. If a manufacturer projects negative emission and/or fuel consumption credits for a family, it must state the source of positive emission and/or fuel consumption credits it expects to use to offset the negative credits demonstrating how it plans to resolve any credit deficits that might occur for a model year within a period of up to three model years after that deficit has occurred.

(B) Actual emissions and fuel consumption credit balances, credit transactions, and credit trades.

(ii) Manufacturers are required to provide updated credit plans after receiving their final verified reports from EPA and NHTSA after the end of each model year.

(iii) The agencies may determine that a manufacturer's plan is unreasonable or unrealistic based on a consideration of past and projected use of specific technologies, the historical sales mix of its vehicle models, subsequent failure to follow any submitted plans, and limited expected access to traded credits.

(iv) The agencies may also consider the plan unreasonable if the manufacturer's credit deficit increases from one model year to the next. The agencies may require that the manufacturers must send interim reports describing its progress toward resolving its credit deficit over the course of a model year.

(v) If NHTSA determines that a manufacturers plan is unreasonable or unrealistic, the manufacturer is deemed as not comply with fuel consumption standards as specified in § 535.10(c) and the manufacturer may be liable for civil penalties.

(7) Revoked credits. NHTSA may revoke fuel consumption credits if unable to verify any information after auditing reports or records or conducting confirmatory testing. In the cases where EPA revokes emissions $CO_2$ credits, NHTSA will revoke the equivalent amount of fuel consumption credits.

(8) Transition to Phase 2 standards. The following provisions allow for enhanced use of fuel consumption credits from Phase 1 tractors and vocational vehicles for meeting the Phase 2 standards:

Add. 39

(i) Fuel consumption credits a manufacturer generates for light and medium heavy-duty vocational vehicles in model years 2018 through 2021 may be used through model year 2027, instead of being limited to a five-year credit life as specified in this part. Fuel consumption credits that small manufacturers generate for heavy heavy-duty vocational vehicles in model years 2018 through may be used through model year 2027, instead of being limited to a five-year credit life as specified in this part. Fuel consumption credits that a small manufacturer generates for vocational vehicles in model year 2022 that are certified to Phase 1 standards as permitted under § 535.3(e)(2)(ii)(B) may be used through model year 2027.

(ii) The manufacturer may use the off-cycle provisions of paragraph (f) of this section to apply technologies to Phase 1 vehicles as follows:

> (A) A manufacturer may apply an improvement factor of 0.988 for tractors and vocational vehicles with automatic tire inflation systems on all axles.

> (B) For vocational vehicles with automatic engine shutdown systems that conform with 40 CFR 1037.660, a manufacturer may apply an improvement factor of 0.95.

> (C) For vocational vehicles with stop-start systems that conform with 40 CFR 1037.660, a manufacturer may apply an improvement factor of 0.92.

> (D) For vocational vehicles with neutral-idle systems conforming with 40 CFR 1037.660, manufacturers may apply an improvement factor of 0.98. Manufacturers may adjust this improvement factor if we approve a partial reduction under 40 CFR 1037.660(a)(2); for example, if the manufacturer's design reduces fuel consumption by half as much as shifting to neutral, it may apply an improvement factor of 0.99.

(9) Credits for small business manufacturers. Small manufacturers may generate fuel consumption credits for natural gas-fueled vocational vehicles as follows:

> (i) Small manufacturers may certify their vehicles instead of relying on the exemption of § 535.3.

**Add. 40**

(ii) Use Phase 1 GEM to determine a fuel consumption level for vehicle, then multiply this value by the engine's FCL for fuel consumption and divide by the engine's applicable fuel consumption standard.

(iii) Use the value determined in paragraph (ii) in the credit equation specified in part (c) of this section in place of the term (Std - FEL).

(iv) The following provisions apply uniquely to small businesses under the custom-chassis standards of § 535.5(b)(6):

> (A) Manufacturers may use fuel consumption credits generated under paragraph (c) of this section, including banked or traded credits from any averaging set. Such credits remain subject to other limitations that apply under this part.

> (B) Manufacturers may produce up to 200 drayage tractors in a given model year to the standards described in § 535.5(b)(6) for "other buses". Treat these drayage tractors as being in their own averaging set. This limit applies with respect to vehicles produced by manufacturers within a control relationship as defined § 534.3.

(10) Certifying non-gasoline engines. A manufacturer producing non-gasoline engines complying with model year 2021 or later medium heavy-duty spark-ignition standards may not generate fuel consumption credits. Only manufacturers producing gasoline engines certifying to spark-ignition standards can generate fuel consumption credits under paragraph (d) of this part.

(11) Fuel consumption credits may not be generated more than once. This means that fuel consumption credits may only be generated once for a given engine or vehicle and fuel consumption credits may not be generated for both a given engine and the vehicle in which the engine is installed. For example, if a manufacturer generates fuel consumption credits for a given hybrid vehicle under this part, no one may generate fuel consumption credits for the associated hybrid engine. This provision, however, does not prevent manufacturers from generating fuel consumption credits for engines that are identical to the given engine in the example if those engines are installed in vehicles for which fuel consumption credits are not generated. This

provision does not impact any adjustment factor or multiplier that is applied to the fuel consumption credits as specified or permitted by this part.

* * * *

**49 C.F.R. § 535.9**

**§ 535.9 Enforcement approach.**

(a) Compliance.

(1) Each year NHTSA will assess compliance with fuel consumption standards as specified in § 535.10.

(i) NHTSA may conduct audits or confirmatory testing on any configuration prior to first sale throughout a given model year or after the model year in order to validate data received from manufacturers and will discuss any potential issues with EPA and the manufacturer. NHTSA may perform confirmatory testing. Any such testing would be performed as specified in EPA's regulations at 40 CFR part 1037. Audits may periodically be performed to confirm manufacturers' credit balances, or other credit transactions or other information submitted to EPA and NHTSA.

(ii) NHTSA may also conduct field inspections either at manufacturing plants or at new vehicle dealerships to validate data received from manufacturers. Field inspections will be carried out in order to validate the condition of vehicles, engines or technology prior to first commercial sale to verify each component's certified configuration as initially built. NHTSA reserves the right to conduct inspections at other locations but will target only those components for which a violation would apply to OEMs and not the fleets or vehicle owners. Compliance inspections could be carried out through a number of approaches including during safety inspections or during compliance safety testing.

(iii) NHTSA will conduct audits and inspections in the same manner and, when possible, in conjunction with EPA. NHTSA will also attempt to coordinate inspections with EPA and share results.

(iv) Documents collected under NHTSA safety authority may be used to support fuel efficiency audits and inspections.

(v) NHTSA may require a manufacturer to perform selective enforcement audits with respect to any GEM inputs in its application for certification or in the end of the year ABT final reports. Any required selective enforcement audits would be required to be conducted in a manner consistent with EPA's corresponding provisions at 40 CFR 1037.301, 1037.305, and 1037.320.

(2) At the end of each model year NHTSA will confirm a manufacturer's fleet or family performance values against the applicable standards and, if a manufacturer uses a credit flexibility, the amount of credits in each averaging set. The averaging set balance is based upon the engines or vehicles performance above or below the applicable regulatory subcategory standards in each respective averaging set and any credits that are traded into or out of an averaging set during the model year.

(i) If the balance is positive, the manufacturer is designated as having a credit surplus.

(ii) If the balance is negative, the manufacturer is designated as having a credit deficit.

(iii) NHTSA will provide notification to each manufacturer confirming its credit balance(s) after the end of each model year directly or through EPA.

(3) Manufacturer are required to confirm the negative balance and submit a fuel consumption credit plan as specified in § 535.7(a) along with supporting documentation indicating how it will allocate existing credits or earn (providing information on future vehicles, engines or technologies), and/or acquire credits, or else be liable for a civil penalty as determined in paragraph (b) of this section. The manufacturer must submit the information within 60 days of receiving agency notification.

(4) Credit shortfall within an averaging set may be carried forward only three years, and if not offset by earned or traded credits, the manufacturer may be liable for a civil penalty as described in paragraph (b) of this section.

(5) Credit allocation plans received from a manufacturer will be reviewed and approved by NHTSA. NHTSA will approve a credit allocation plan unless it determines that the proposed credits are unavailable or that it is unlikely that the plan will result in the manufacturer earning or acquiring sufficient credits to offset the subject credit shortfall. In the case where a manufacturer submits a plan to acquire future model year credits earned by another manufacturer, NHTSA will require a signed agreement by both manufacturers to initiate a review of the plan. If a plan is approved, NHTSA will revise the respective manufacturer's credit account accordingly by identifying which existing or traded credits are being used to address the credit shortfall, or by identifying the manufacturer's plan to earn future credits for addressing the respective credit shortfall. If a plan is rejected, NHTSA will notify the respective manufacturer and request a revised plan. The manufacturer must submit a revised plan within 14 days of receiving agency notification. The agency will provide a manufacturer one opportunity to submit a revised credit allocation plan before it initiates civil penalty proceedings.

(6) For purposes of this regulation, NHTSA will treat the use of future credits for compliance, as through a credit allocation plan, as a deferral of civil penalties for non-compliance with an applicable fuel consumption standard.

(7) If NHTSA receives and approves a manufacturer's credit allocation plan to earn future credits within the following three model years in order to comply with regulatory obligations, NHTSA will defer levying civil penalties for non-compliance until the date(s) when the manufacturer's approved plan indicates that credits will be earned or acquired to achieve compliance, and upon receiving confirmed $CO_2$ emissions and fuel consumption data from EPA. If the manufacturer fails to acquire or earn sufficient credits by the plan dates, NHTSA will initiate civil penalty proceedings.

(8) In the event that NHTSA fails to receive or is unable to approve a plan for a non-compliant manufacturer due to insufficiency or untimeliness, NHTSA may initiate civil penalty proceedings.

(9) In the event that a manufacturer fails to report accurate fuel consumption data for vehicles or engines covered under this rule,

noncompliance will be assumed until corrected by submission of the required data, and NHTSA may initiate civil penalty proceedings.

(10) If EPA suspends or revoke a certificate of conformity as specified in 40 CFR 1036.255 or 1037.255, and a manufacturer is unable to take a corrective action allowed by EPA, noncompliance will be assumed, and NHTSA may initiate civil penalty proceedings or revoke fuel consumption credits.

(b) Civil penalties—

(1) Generally. NHTSA may assess a civil penalty for any violation of this part under 49 U.S.C. 32902(k). This section states the procedures for assessing civil penalties for violations of § 535.3(h). The provisions of 5 U.S.C. 554, 556, and 557 do not apply to any proceedings conducted pursuant to this section.

(2) Initial determination of noncompliance. An action for civil penalties is commenced by the execution of a Notice of Violation. A determination by NHTSA's Office of Enforcement of noncompliance with applicable fuel consumption standards utilizing the certified and reported $CO_2$ emissions and fuel consumption data provided by the Environmental Protection Agency as described in this part, and after considering all the flexibilities available under § 535.7, underlies a Notice of Violation. If NHTSA Enforcement determines that a manufacturer's averaging set of vehicles or engines fails to comply with the applicable fuel consumption standard(s) by generating a credit shortfall, the incomplete vehicle, complete vehicle or engine manufacturer, as relevant, shall be subject to a civil penalty.

(3) Numbers of violations and maximum civil penalties. Any violation shall constitute a separate violation with respect to each vehicle or engine within the applicable regulatory averaging set. The maximum civil penalty is not more than $37,500.00 per vehicle or engine. The maximum civil penalty under this section for a related series of violations shall be determined by multiplying $37,500.00 times the vehicle or engine production volume for the model year in question within the regulatory averaging set. NHTSA may adjust this civil penalty amount to account for inflation.

(4) Factors for determining penalty amount. In determining the amount of any civil penalty proposed to be assessed or assessed under

this section, NHTSA shall take into account the gravity of the violation, the size of the violator's business, the violator's history of compliance with applicable fuel consumption standards, the actual fuel consumption performance related to the applicable standards, the estimated cost to comply with the regulation and applicable standards, the quantity of vehicles or engines not complying, and the effect of the penalty on the violator's ability to continue in business. The "estimated cost to comply with the regulation and applicable standards," will be used to ensure that penalties for non-compliance will not be less than the cost of compliance.

(5) NHTSA enforcement report of determination of non-compliance.

(i) If NHTSA Enforcement determines that a violation has occurred, NHTSA Enforcement may prepare a report and send the report to the NHTSA Chief Counsel.

(ii) The NHTSA Chief Counsel will review the report prepared by NHTSA Enforcement to determine if there is sufficient information to establish a likely violation.

(iii) If the Chief Counsel determines that a violation has likely occurred, the Chief Counsel may issue a Notice of Violation to the party.

(iv) If the Chief Counsel issues a Notice of Violation, he or she will prepare a case file with recommended actions. A record of any prior violations by the same party shall be forwarded with the case file.

(6) Notice of violation.

(i) The Notice of Violation will contain the following information:

(A) The name and address of the party;

(B) The alleged violation(s) and the applicable fuel consumption standard(s) violated;

(C) The amount of the proposed penalty and basis for that amount;

(D) The place to which, and the manner in which, payment is to be made;

(E) A statement that the party may decline the Notice of Violation and that if the Notice of Violation is declined within 30

days of the date shown on the Notice of Violation, the party has the right to a hearing, if requested within 30 days of the date shown on the Notice of Violation, prior to a final assessment of a penalty by a Hearing Officer; and

(F) A statement that failure to either pay the proposed penalty or to decline the Notice of Violation and request a hearing within 30 days of the date shown on the Notice of Violation will result in a finding of violation by default and that NHTSA will proceed with the civil penalty in the amount proposed on the Notice of Violation without processing the violation under the hearing procedures set forth in this subpart.

(ii) The Notice of Violation may be delivered to the party by—

(A) Mailing to the party (certified mail is not required);

(B) Use of an overnight or express courier service; or

(C) Facsimile transmission or electronic mail (with or without attachments) to the party or an employee of the party.

(iii) At any time after the Notice of Violation is issued, NHTSA and the party may agree to reach a compromise on the payment amount.

(iv) Once a penalty amount is paid in full, a finding of "resolved with payment" will be entered into the case file.

(v) If the party agrees to pay the proposed penalty, but has not made payment within 30 days of the date shown on the Notice of Violation, NHTSA will enter a finding of violation by default in the matter and NHTSA will proceed with the civil penalty in the amount proposed on the Notice of Violation without processing the violation under the hearing procedures set forth in this subpart.

(vi) If within 30 days of the date shown on the Notice of Violation a party fails to pay the proposed penalty on the Notice of Violation, and fails to request a hearing, then NHTSA will enter a finding of violation by default in the case file, and will assess the civil penalty in the amount set forth on the Notice of Violation without processing the violation under the hearing procedures set forth in this subpart.

(vii) NHTSA's order assessing the civil penalty following a party's default is a final agency action.

(7) Hearing Officer.

(i) If a party timely requests a hearing after receiving a Notice of Violation, a Hearing Officer shall hear the case.

(ii) The Hearing Officer will be appointed by the NHTSA Administrator, and is solely responsible for the case referred to him or her. The Hearing Officer shall have no other responsibility, direct or supervisory, for the investigation of cases referred for the assessment of civil penalties. The Hearing Officer shall have no duties related to the light-duty fuel economy or medium- and heavy-duty fuel efficiency programs.

(iii) The Hearing Officer decides each case on the basis of the information before him or her.

(8) Initiation of action before the Hearing Officer.

(i) After the Hearing Officer receives the case file from the Chief Counsel, the Hearing Officer notifies the party in writing of—

(A) The date, time, and location of the hearing and whether the hearing will be conducted telephonically or at the DOT Headquarters building in Washington, DC;

(B) The right to be represented at all stages of the proceeding by counsel as set forth in paragraph (b)(9) of this section; and

(C) The right to a free copy of all written evidence in the case file.

(ii) On the request of a party, or at the Hearing Officer's direction, multiple proceedings may be consolidated if at any time it appears that such consolidation is necessary or desirable.

(9) Counsel. A party has the right to be represented at all stages of the proceeding by counsel. A party electing to be represented by counsel must notify the Hearing Officer of this election in writing, after which point the Hearing Officer will direct all further communications to that counsel. A party represented by counsel bears all of its own attorneys' fees and costs.

(10) Hearing location and costs.

(i) Unless the party requests a hearing at which the party appears before the Hearing Officer in Washington, DC, the hearing may be held telephonically. In Washington, DC, the hearing is held at the headquarters of the U.S. Department of Transportation.

(ii) The Hearing Officer may transfer a case to another Hearing Officer at a party's request or at the Hearing Officer's direction.

(iii) A party is responsible for all fees and costs (including attorneys' fees and costs, and costs that may be associated with travel or accommodations) associated with attending a hearing.

(11) Hearing procedures.

(i) There is no right to discovery in any proceedings conducted pursuant to this subpart.

(ii) The material in the case file pertinent to the issues to be determined by the Hearing Officer is presented by the Chief Counsel or his or her designee.

(iii) The Chief Counsel may supplement the case file with information prior to the hearing. A copy of such information will be provided to the party no later than three business days before the hearing.

(iv) At the close of the Chief Counsel's presentation of evidence, the party has the right to examine respond to and rebut material in the case file and other information presented by the Chief Counsel. In the case of witness testimony, both parties have the right of cross-examination.

(v) In receiving evidence, the Hearing Officer is not bound by strict rules of evidence. In evaluating the evidence presented, the Hearing Officer must give due consideration to the reliability and relevance of each item of evidence.

(vi) At the close of the party's presentation of evidence, the Hearing Officer may allow the introduction of rebuttal evidence that may be presented by the Chief Counsel.

(vii) The Hearing Officer may allow the party to respond to any rebuttal evidence submitted.

(viii) After the evidence in the case has been presented, the Chief Counsel and the party may present arguments on the issues in the case. The party may also request an opportunity to submit a written statement for consideration by the Hearing Officer and for further review. If granted, the Hearing Officer shall allow a reasonable time for submission of the statement and shall specify the date by which it must be received. If the statement is not received within the time prescribed, or within the limits of any extension of time granted by the Hearing Officer, it need not be considered by the Hearing Officer.

(ix) A verbatim transcript of the hearing will not normally be prepared. A party may, solely at its own expense, cause a verbatim transcript to be made. If a verbatim transcript is made, the party shall submit two copies to the Hearing Officer not later than 15 days after the hearing. The Hearing Officer shall include such transcript in the record.

(12) Determination of violations and assessment of civil penalties.

(i) Not later than 30 days following the close of the hearing, the Hearing Officer shall issue a written decision on the Notice of Violation, based on the hearing record. This may be extended by the Hearing officer if the submissions by the Chief Counsel or the party are voluminous. The decision shall address each alleged violation, and may do so collectively. For each alleged violation, the decision shall find a violation or no violation and provide a basis for the finding. The decision shall set forth the basis for the Hearing Officer's assessment of a civil penalty, or decision not to assess a civil penalty. In determining the amount of the civil penalty, the gravity of the violation, the size of the violator's business, the violator's history of compliance with applicable fuel consumption standards, the actual fuel consumption performance related to the applicable standard, the estimated cost to comply with the regulation and applicable standard, the quantity of vehicles or engines not complying, and the effect of the penalty on the violator's ability to continue in business. The assessment of a civil penalty by the Hearing Officer shall be set forth in an accompanying final order. The Hearing Officer's written final order is a final agency action.

(ii) If the Hearing Officer assesses civil penalties in excess of $1,000,000, the Hearing Officer's decision shall contain a statement advising the party of the right to an administrative appeal to the Administrator within a specified period of time. The party is advised that failure to submit an appeal within the prescribed time will bar its consideration and that failure to appeal on the basis of a particular issue will constitute a waiver of that issue in its appeal before the Administrator.

(iii) The filing of a timely and complete appeal to the Administrator of a Hearing Officer's order assessing a civil penalty shall suspend the operation of the Hearing Officer's penalty, which shall no longer be a final agency action.

(iv) There shall be no administrative appeals of civil penalties assessed by a Hearing Officer of less than $1,000,000.

(13) Appeals of civil penalties in excess of $1,000,000.

(i) A party may appeal the Hearing Officer's order assessing civil penalties over $1,000,000 to the Administrator within 21 days of the date of the issuance of the Hearing Officer's order.

(ii) The Administrator will review the decision of the Hearing Officer de novo, and may affirm the decision of the hearing officer and assess a civil penalty, or

(iii) The Administrator may—

(A) Modify a civil penalty;

(B) Rescind the Notice of Violation; or

(C) Remand the case back to the Hearing Officer for new or additional proceedings.

(iv) In the absence of a remand, the decision of the Administrator in an appeal is a final agency action.

(14) Collection of assessed or compromised civil penalties.

(i) Payment of a civil penalty, whether assessed or compromised, shall be made by check, postal money order, or electronic transfer of funds, as provided in instructions by the agency. A payment of civil penalties shall not be considered a request for a hearing.

Add. 51

(ii) The party must remit payment of any assessed civil penalty to NHTSA within 30 days after receipt of the Hearing Officer's order assessing civil penalties, or, in the case of an appeal to the Administrator, within 30 days after receipt of the Administrator's decision on the appeal.

(iii) The party must remit payment of any compromised civil penalty to NHTSA on the date and under such terms and conditions as agreed to by the party and NHTSA. Failure to pay may result in NHTSA entering a finding of violation by default and assessing a civil penalty in the amount proposed in the Notice of Violation without processing the violation under the hearing procedures set forth in this part.

(c) Changes in corporate ownership and control. Manufacturers must inform NHTSA of corporate relationship changes to ensure that credit accounts are identified correctly and credits are assigned and allocated properly.

(1) In general, if two manufacturers merge in any way, they must inform NHTSA how they plan to merge their credit accounts. NHTSA will subsequently assess corporate fuel consumption and compliance status of the merged fleet instead of the original separate fleets.

(2) If a manufacturer divides or divests itself of a portion of its automobile manufacturing business, it must inform NHTSA how it plans to divide the manufacturer's credit holdings into two or more accounts. NHTSA will subsequently distribute holdings as directed by the manufacturer, subject to provision for reasonably anticipated compliance obligations.

(3) If a manufacturer is a successor to another manufacturer's business, it must inform NHTSA how it plans to allocate credits and resolve liabilities per 49 CFR part 534.

## 49 C.F.R. § 536.5

### § 536.5 Trading infrastructure.

(a) Accounts. NHTSA maintains "accounts" for each credit holder. The account consists of a balance of credits in each compliance category and vintage held by the holder.

(b) Who may hold credits. Every manufacturer subject to fuel economy standards under part 531 or 533 of this chapter is automatically an account holder. If the manufacturer earns credits pursuant to this part, or receives credits from another party, so that the manufacturer's account has a non-zero balance, then the manufacturer is also a credit holder. Any party designated as a recipient of credits by a current credit holder will receive an account from NHTSA and become a credit holder, subject to the following conditions:

(1) A designated recipient must provide name, address, contacting information, and a valid taxpayer identification number or Social Security number;

(2) NHTSA does not grant a request to open a new account by any party other than a party designated as a recipient of credits by a credit holder; and

(3) NHTSA maintains accounts with zero balances for a period of time, but reserves the right to close accounts that have had zero balances for more than one year.

(c) Automatic debits and credits of accounts.

(1) To carry credits forward, backward, transfer credits, or trade credits into other credit accounts, a manufacturer or credit holder must submit a credit instruction to NHTSA. A credit instruction must detail and include:

(i) The credit holder(s) involved in the transaction.

(ii) The originating credits described by the amount of the credits, compliance category and the vintage of the credits.

(iii) The recipient credit account(s) for banking or applying the originating credits described by the compliance category(ies), model year(s), and if applicable the adjusted credit amount(s) and adjustment factor(s).

(iv) For trades, a contract authorizing the trade signed by the manufacturers or credit holders or by managers legally authorized to obligate the sale and purchase of the traded credits.

(2) Upon receipt of a credit instruction from an existing credit holder, NHTSA verifies the presence of sufficient credits in the account(s) of

the credit holder(s) involved as applicable and notifies the credit holder(s) that the credits will be debited from and/or credited to the accounts involved, as specified in the credit instruction. NHTSA determines if the credits can be debited or credited based upon the amount of available credits, accurate application of any adjustment factors and the credit requirements prescribed by this part that are applicable at the time the transaction is requested.

(3) After notifying the credit holder(s), all accounts involved are either credited or debited, as appropriate, in line with the credit instruction. Traded credits identified by a specific compliance category are deposited into the recipient's account in that same compliance category and model year. If a recipient of credits as identified in a credit instruction is not a current account holder, NHTSA establishes the credit recipient's account, subject to the conditions described in paragraph (b) of this section, and adds the credits to the newly-opened account.

(4) NHTSA will automatically delete unused credits from holders' accounts when those credits reach their expiry date.

(5) Starting January 1, 2022, all parties trading credits must also provide NHTSA the price paid for the credits including a description of any other monetary or non-monetary terms affecting the price of the traded credits, such as any technology exchanged or shared in exchange for the credits, any other non-monetary payment for the credits, or any other agreements related to the trade.

(6) Starting September 1, 2022, manufacturers or credit holders issuing credit instructions or providing credit allocation plans as specified in paragraph (d) of this section, must use and submit the NHTSA Credit Template fillable form (Office of Management and Budget (OMB) Control No. 2127–0019, NHTSA Form 1475). In the case of a trade, manufacturers or credit holders buying traded credits must use the credit transactions template to submit trade instructions to NHTSA. Manufacturers or credit holders selling credits are not required to submit trade instructions. The NHTSA Credit Template must be signed by managers legally authorized to obligate the sale and/or purchase of the traded credits from both parties to the trade. The NHTSA Credit Template signed by both parties to the trade serves as an acknowledgement that the parties have agreed to trade a

certain amount of credits, and does not dictate terms, conditions, or other business obligations of the parties.

(7) NHTSA will consider claims that information submitted to the agency under this section is entitled to confidential treatment under 5 U.S.C. 552(b) and under the provisions of part 512 of this chapter if the information is submitted in accordance with the procedures of part 512. The NHTSA Credit Template is available for download on the CAFE Public Information Center website. Manufacturers must submit the cost information to NHTSA in a PDF document along with the Credit Template through the CAFE email, cafe@dot.gov. NHTSA reserves the right to request additional information from the parties regarding the terms of the trade.

(d) Compliance.

(1) NHTSA assesses compliance with fuel economy standards each year, utilizing the certified and reported CAFE data provided by the Environmental Protection Agency (EPA) for enforcement of the CAFE program pursuant to 49 U.S.C. 32904(e). Credit values are calculated based on the CAFE data from the EPA. If a particular compliance category within a manufacturer's fleet has above standard fuel economy, NHTSA adds credits to the manufacturer's account for that compliance category and vintage in the appropriate amount by which the manufacturer has exceeded the applicable standard.

(2) If a manufacturer's vehicles in a particular compliance category have below standard fuel economy, NHTSA will provide written notification to the manufacturer that it has failed to meet a particular fleet target standard. The manufacturer will be required to confirm the shortfall and must either: submit a plan indicating how it will allocate existing credits or earn, transfer and/or acquire credits; or pay the appropriate civil penalty. The manufacturer must submit a plan or payment within 60 days of receiving agency notification.

(3) Credits used to offset shortfalls are subject to the three- and five-year limitations as described in § 536.6.

(4) Transferred credits are subject to the limitations specified by 49 U.S.C. 32903(g)(3) and this part.

(5) The value, when used for compliance, of any credits received via trade or transfer is adjusted, using the adjustment factor described in § 536.4(c), pursuant to 49 U.S.C. 32903(f)(1).

(6) Credit allocation plans received from a manufacturer will be reviewed and approved by NHTSA. Starting in model year 2022, credit holders must use the NHTSA Credit Template (OMB Control No. 2127–0019, NHTSA Forms 1475) to record the credit transactions. The template is a fillable form that has an option for recording and calculating credit transactions for credit allocation plans. The template calculates the required adjustments to the credits. The credit allocation plan and the completed transaction templates must be submitted to NHTSA. NHTSA will approve the credit allocation plan unless it finds that the proposed credits are unavailable or that it is unlikely that the plan will result in the manufacturer earning sufficient credits to offset the subject credit shortfall. If the plan is approved, NHTSA will revise the respective manufacturer's credit account accordingly. If the plan is rejected, NHTSA will notify the respective manufacturer and request a revised plan or payment of the appropriate fine.

(e) Reporting.

(1) NHTSA periodically publishes the names and credit holdings of all credit holders. NHTSA does not publish individual transactions, nor respond to individual requests for updated balances from any party other than the account holder.

(2) NHTSA issues an annual credit status letter to each party that is a credit holder at that time. The letter to a credit holder includes a credit accounting record that identifies the credit status of the credit holder including any activity (earned, expired, transferred, traded, carry-forward and carry-back credit transactions/allocations) that took place during the identified activity period.

## 49 C.F.R. § 536.8

## § 536.8 Conditions for trading of credits.

(a) Trading of credits. If a credit holder wishes to trade credits to another party, the current credit holder and the receiving party must jointly issue

an instruction to NHTSA, identifying the quantity, vintage, compliance category, and originator of the credits to be traded. If the recipient is not a current account holder, the recipient must provide sufficient information for NHTSA to establish an account for the recipient. Once an account has been established or identified for the recipient, NHTSA completes the trade by debiting the transferor's account and crediting the recipient's account. NHTSA will track the quantity, vintage, compliance category, and originator of all credits held or traded by all account-holders.

(b) Trading between and within compliance categories. For credits earned in model year 2011 or thereafter, and used to satisfy compliance obligations for model year 2011 or thereafter:

(1) Manufacturers may use credits originally earned by another manufacturer in a particular compliance category to satisfy compliance obligations within the same compliance category.

(2) Once a manufacturer acquires by trade credits originally earned by another manufacturer in a particular compliance category, the manufacturer may transfer the credits to satisfy its compliance obligations in a different compliance category, but only to the extent that the CAFE increase attributable to the transferred credits does not exceed the limits in 49 U.S.C. 32903(g)(3). For any compliance category, the sum of a manufacturer's transferred credits earned by that manufacturer and transferred credits obtained by that manufacturer through trade must not exceed that limit.

(c) Changes in corporate ownership and control. Manufacturers must inform NHTSA of corporate relationship changes to ensure that credit accounts are identified correctly and credits are assigned and allocated properly.

(1) In general, if two manufacturers merge in any way, they must inform NHTSA how they plan to merge their credit accounts. NHTSA will subsequently assess corporate fuel economy and compliance status of the merged fleet instead of the original separate fleets.

(2) If a manufacturer divides or divests itself of a portion of its automobile manufacturing business, it must inform NHTSA how it plans to divide the manufacturer's credit holdings into two or more accounts. NHTSA will subsequently distribute holdings as directed by

the manufacturer, subject to provision for reasonably anticipated compliance obligations.

(3) If a manufacturer is a successor to another manufacturer's business, it must inform NHTSA how it plans to allocate credits and resolve liabilities per part 534 of this chapter.

(d) No short or forward sales. NHTSA will not honor any instructions to trade or transfer more credits than are currently held in any account. NHTSA will not honor instructions to trade or transfer credits from any future vintage (i.e., credits not yet earned). NHTSA will not participate in or facilitate contingent trades.

(e) Cancellation of credits. A credit holder may instruct NHTSA to cancel its currently held credits, specifying the originating manufacturer, vintage, and compliance category of the credits to be cancelled. These credits will be permanently null and void; NHTSA will remove the specific credits from the credit holder's account, and will not reissue them to any other party.

(f) Errors or fraud in earning credits. If NHTSA determines that a manufacturer has been credited, through error or fraud, with earning credits, NHTSA will cancel those credits if possible. If the manufacturer credited with having earned those credits has already traded them when the error or fraud is discovered, NHTSA will hold the receiving manufacturer responsible for returning the same or equivalent credits to NHTSA for cancellation.

(g) Error or fraud in trading. In general, all trades are final and irrevocable once executed, and may only be reversed by a new, mutually-agreed transaction. If NHTSA executes an erroneous instruction to trade credits from one holder to another through error or fraud, NHTSA will reverse the transaction if possible. If those credits have been traded away, the recipient holder is responsible for obtaining the same or equivalent credits for return to the previous holder.

## 49 C.F.R. § 553.13

### § 553.13 Notice of proposed rulemaking.

Unless the Administrator, for good cause, finds that notice is impracticable, unnecessary, or contrary to the public interest, and

incorporates that finding and a brief statement of the reasons for it in the rule, a notice of proposed rulemaking is issued and interested persons are invited to participate in the rulemaking proceedings under applicable provisions of Title 49.